921 P.2d 122

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Robert Steven MOORE, Defendant–Appellant.**

**No. 17872.**

Supreme Court of Hawai'i.

July 17, 1996.

Peter Van Name Esser, on the briefs, Honolulu, for defendant-appellant Robert Steven Moore.

Caroline M. Mee, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee State of Hawai'i.

Before MOON, C.J., and LEVINSON, NAKAYAMA and RAMIL, JJ., and CHANG, Circuit Judge, in place of KLEIN, J., Recused.

MOON, Chief Justice.

Following a jury trial, defendant-appellant Robert Steven Moore was found guilty of attempted second degree murder, in violation of Hawai'i Revised Statutes (HRS) §§ 707–701.5 and 705–500 (1985), and use of a firearm in the commission of a felony, in violation of HRS § 134–6 (1985). On appeal, Moore argues that: (1) the trial court committed plain error when it failed, *sua sponte,* to instruct the jury on (a) the included offense of attempted reckless manslaughter

and (b) the mitigating defense of attempted extreme mental or emotional disturbance (EMED) manslaughter;[1] (2) the trial court's denial of his motion for new trial, based on prejudicial opening statements, violated his rights to due process and confrontation; (3) the trial court lacked jurisdiction to enter guilty verdicts because the complaint failed to allege a material element of attempted second degree murder, and, therefore, the trial court erred in denying defendant's motions to dismiss the complaint and for arrest of judgment; and (4) the trial court abused its discretion when it allowed the prosecution to elicit hearsay testimony under the "then-existing mental, emotional, or physical condition" and "former testimony" exceptions. For the reasons discussed below, we disagree with Moore's contentions and affirm his conviction.

## I. BACKGROUND

At trial, the events of January 7, 1992, which form the basis of Moore's conviction, were related by Honolulu Police Department (HPD) officers April Daniels and Calvin Tong. Both officers testified that, on the evening of January 7, 1992, at approximately 10:00 p.m., they were preparing to depart from a call on Kahala Avenue when a light-colored Mercedes drove up behind their parked cars with its lights flashing and horn honking. Moore got out of the Mercedes, approached the officers, and said that "someone shot my wife." Officer Daniels proceeded to Moore's vehicle, looked in, and saw Lani Moore, Moore's wife (Mrs. Moore), sitting in the passenger seat. Officer Daniels testified that:

> [Mrs. Moore's] head was resting against the headrest. There was blood on the front of her white-colored shirt from the upper chest area down to the waistline. She was holding her hand flat against her

chest. She was perspiring. Her voice was barely audible.

Officer Daniels also observed a large hole in the windshield and a bloody napkin wedged between the passenger seat and the console. While waiting for an ambulance, Mrs. Moore told Officer Daniels that "[h]e shot me." Officer Daniels pointed to Moore, who was outside the car with Officer Tong, and asked if she meant him. Mrs. Moore responded affirmatively and stated: "He's a good man. I told him I was leaving him. He's distraught." Mrs. Moore then asked Officer Daniels whether she was going to die, and "[w]hat about my kids?" She told Officer Daniels, "Keep him away from me," and "get him away from me."

Officer Daniels heard Moore tell Officer Tong, "I didn't do it. What is she telling that officer?" Officer Tong testified that Moore, after repeatedly being asked, finally identified the shooter only as an "oriental male," who had also stolen his wallet. Officer Daniels signaled Officer Tong and indicated to him that Mrs. Moore had stated that Moore had shot her. Officer Tong arrested Moore, who resisted being handcuffed and said, "What's my wife telling the Officer? I didn't do it. I know we're having problems, but I didn't do it."

Mrs. Moore was taken to the hospital, where the treating physician determined that she had been shot five times. One bullet caused a superficial scalp wound; one passed through her chest, punctured her lung, and stopped just under the skin in her back; one entered the back of her left shoulder; one entered the left side of her neck, tore her esophagus, and passed into the right side of her neck; and one wounded the middle finger of her left hand.

On January 16, 1992, the prosecution filed a two-count complaint against Moore.[2] With

---

1. Moore alternatively claims that defense counsel's failure to request the instructions amounts to ineffective assistance of counsel, but he presents no discernable argument in support of his contention; therefore, it is our prerogative to disregard this claim. *State v. Lopez*, 78 Hawai'i 433, 452, 896 P.2d 889, 908 (1995) (citing *Loui v. Board of Medical Examiners*, 78 Hawai'i 21 n. 19, 889 P.2d 705, 713 n. 19 (1995).

2. An amended complaint was filed on October 11, 1993. The purpose of the amendment was to allege the use of a firearm in count I as an aggravating circumstance that could support the imposition of an enhanced sentence consistent with the Intermediate Court of Appeals's (ICA) opinion in *State v. Schroeder*, 10 Haw.App. 535, 880 P.2d 208 (1992) (holding that a defendant may not be given an enhanced sentence on ac-

respect to count I, attempted second degree murder, the complaint alleged that:

> On or about the 7th day of January, 1992, in the City and County of Honolulu, State of Hawaii, Robert Steven Moore did intentionally engage in conduct which is a substantial step in the course of conduct intended or known to cause the death of Lani Moore, thereby committing the offense of Attempted Murder in the Second Degree, in violation of Section[s] 705–500,[3] 707–701.5(1)[4] and 706–656[5] of the Hawaii Revised Statutes.

Moore was held without bail. On January 7, 1993, Mrs. Moore testified in support of Moore's motion for supervised release. On cross-examination, the prosecutor asked, "Mrs. Moore, on January 7, 1992, it was your husband who shot you five times; is that correct?" Mrs. Moore responded, "Four or five, I'm not certain."

The trial began on December 3, 1993. The prosecution's opening statement described the encounter between Moore and Officers Daniels and Tong. Next, the prosecutor described the Moores' marriage, personal histories, careers, and marital difficulties. The prosecutor then described the circumstances of the shooting as follows:

> It was the defendant's idea to go to Diamond Head Circle, the top of the circle, after dinner. He took Lani Moore up there, and parked on the right-hand side of the road at the top of Diamond Head Circle....
>
> ....
>
> ... Lani Moore's head was facing up towards the property [that Moore was showing her] when she heard a sound and felt a tingling sensation to the back of her

head. She turned around and saw the defendant facing her. That's when she heard another loud sound and felt pain in the right chest.

> ....
>
> It was at this point that Lani Moore felt very weak. There was no struggle. Everything sounded muffled. She felt that tingling sensation to the back of her head. It was then she started begging the defendant for help. "Get me to a hospital." The defendant said to her, at that point, he was taking her to the hospital. But Lani Moore quickly realized that he was not heading towards the hospital.... Lani Moore continued to bleed and continued to beg the defendant to take her to the hospital.
>
> The defendant said to her at one point during the shooting, "I know what you're up to. You want to take the children away from me, and I'm not going to let you do that."
>
> ....
>
> ... This continued for the next thirty minutes, Lani Moore begging to get help, stating to him that she thought she was dying, and the defendant agreeing to get her help....
>
> It was then that the defendant said the only way he was going to get her help is if she agreed with him that it was a robber, that somebody else had shot her. Out of fear she said she would. And she told him to get rid of the gun.
>
> ... Lani Moore remembers the defendant reaching underneath the seat and she remembers seeing two flashes. She remembers feeling pain to the left of her neck and her shoulder....

count of aggravating circumstances that are not alleged in the complaint or indictment), *affirmed on other grounds,* 76 Hawai'i 517, 880 P.2d 192 (1994). The amendment did not change the disputed language in count I.

3. The pertinent text of HRS § 705–500 (1993) is quoted and discussed in Section II.C., *infra.*

4. HRS § 707–701.5(1) (1993) provides that, "[e]xcept as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

5. HRS § 706–656 (1993) provides in relevant part:

> (2) Persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the Hawaii paroling authority; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment[.]

Out of fear, she continued to tell Robert Moore that she would go along with his story and to get rid of the gun. She did not want him to shoot her a third time in a third location. . . .

. . . .

It was the next day, January 8th, around 5:00 p.m., that Lani Moore, although under medication, gave a 45–minute, detailed statement to Detective Joseph Natividad, from the Honolulu Police Department. The statement was largely narrative [sic] and without prompting by the detective. . . . That would be the last statement that Lani Moore would make regarding the shooting of January 7th, 1992.

On the first day of trial, Officer Daniels took the stand and, over the defense's objection, was allowed to testify to the statements made to her by Mrs. Moore. The court ruled that the statements did not fall within the "excited utterance" or "present sense impression" hearsay exceptions, but, on its own initiative, found the statements admissible under Hawai'i Rules of Evidence (HRE) Rule 803(b)(3),[6] as statements of then existing physical, mental, or emotional condition. The court allowed Officer Daniels to relate Mrs. Moore's statements, but gave a limiting instruction to the jury that Daniels's testimony "is limited solely for the purposes of explaining and describing Lani Moore's then existing mental, emotional or physical condition."

On the second day of trial, the prosecutor informed the court that he had learned that Mrs. Moore had left the state. He also indicated that, if he could not locate her, he would be putting on witnesses to establish Mrs. Moore's unavailability. A hearing was held later that day, out of the presence of the jury, on the issue of Mrs. Moore's unavailability, and the admissibility of her former testimony.

The prosecution established that Mrs. Moore had been subpoenaed on July 2, 1993, for trial the week of November 22, 1993. The prosecutor was placed under oath and testified that, during the week prior to November 22, 1993, he had telephoned Mrs.

Moore and left a message on her answering machine that he was calling to inform her that court was not meeting on November 22 and to please return his call so that he could advise her of the date that her presence would be required. The prosecutor further testified that, when Mrs. Moore returned his call,

Ms. Moore informed me at that time that she would know when to come to court. I informed her of her subpoena, she acknowledged her subpoena, and she stated that she would know when to come to court.

I asked her at that point how she would know when to come to court and she said that she would be informed and she hung up at that time, without allowing me an opportunity to inform her as to the new date.

The prosecution reviewed the efforts that it had made over the preceding weekend to locate Mrs. Moore. A prosecution investigator testified that he had attempted to serve Mrs. Moore with a new subpoena at her home seven times in two days and had made two telephone calls, leaving his pager number for Mrs. Moore to contact. He testified that, on Sunday, December 5, 1993, while attempting to serve Mrs. Moore at her home, he had spoken with the Moores' nanny, who told him that Mrs. Moore had left for California with her children four days earlier and that the nanny did not know when Mrs. Moore would be returning or how to contact her. The prosecutor testified that, when the investigator was unable to serve Mrs. Moore, the prosecutor called Mrs. Moore's brother-in-law in California. He was told by Mrs. Moore's brother-in-law that she had been there and that her children were still there, but Mrs. Moore had left earlier that day without disclosing her destination. Mrs. Moore's brother-in-law stated that he believed Mrs. Moore was flying back to Hawaii to testify at trial.

The prosecution requested a continuance to allow time to locate Mrs. Moore and to secure her presence. The court denied the continuance, finding that there was no evi-

---

**6.** The pertinent text of HRE Rule 803(b)(3) is quoted and discussed in Section II.D.1., *infra.*

dence that an additional few days was likely to change the situation. The court ruled that Mrs. Moore was unavailable as a witness and that the prosecution had made a good faith attempt to secure her presence. The court also ruled that Mrs. Moore's former testimony that it was her husband who had shot her five times, which was given at the January 7, 1993 supervised release hearing, was admissible under HRE Rule 804(b)(1).[7] However, Mrs. Moore's testimony, given at the hearing on the prosecution's motion to disqualify defense counsel, as well as other portions of her testimony at the January 7, 1993 supervised release hearing and a forty-three page statement that she had given to an HPD detective from her hospital bed, were ruled inadmissible.

After reading the permissible portion of Mrs. Moore's testimony into the record, the prosecution rested. The defense moved for a judgment of acquittal, which the court denied. The defense then introduced three stipulated exhibits—photographs showing the path of the bullets inside the car—and rested. The prosecution did not present any rebuttal evidence.

During the settling of jury instructions, the defense argued that the element of intent was missing from the prosecution's proposed instruction on attempted second degree murder. Noting that the proposed instruction tracked the language of the complaint, the defense orally moved to dismiss the complaint. The motion was denied, and the proposed instruction was modified.

The defense requested an instruction on second degree reckless endangering, and the court ruled that, because there was "a scintilla" of evidence in the record to support the instruction, citing the photographs of errant shots, the instruction would be allowed. The court also included an instruction on first degree reckless endangering. Although an instruction on EMED manslaughter had been proposed by the prosecution, the instruction was withdrawn, without objection by the defense, when Mrs. Moore failed to testify.

The jury returned a verdict of guilty on December 10, 1993. On January 4, 1994, Moore filed a motion for judgment of acquittal or new trial, claiming that: (1) the guilty verdicts were based entirely on hearsay; (2) the opening statements contained prejudicial facts that could not be cured by jury instructions; and (3) the prosecution violated discovery rules. Moore also filed a motion for arrest of judgment on January 4, 1994, claiming that the amended complaint omitted a necessary element of attempted murder. On February 7, 1994, the court orally denied both motions and imposed sentence. This timely appeal followed.

## II. *DISCUSSION*

### A. *Failure to Give Attempted Manslaughter Instructions*

Moore argues that the court erred when it failed, *sua sponte*, to instruct the jury on the included offense of attempted reckless manslaughter and the mitigating defense of attempted EMED manslaughter. "When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading." *State v. Kinnane*, 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) (quoting *State v. Kelekolio*, 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993)).

### 1. **Attempted Reckless Manslaughter**

■ Under HRS § 701–109(5) (1993), if there is "a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense," the court must charge the jury with respect to the included offense, "unless (1) the prosecution does not request that included instructions be given

---

**7.** HRE Rule 804(b)(1) excepts from the hearsay rule

[t]estimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding,

at the instance of or against a party with an opportunity to develop the testimony by direct, cross, or redirect examination, with motive and interest similar to those of the party against whom now offered[.]

and (2) the defendant specifically objects to the included offense instructions for tactical reasons." *State v. Kupau,* 76 Hawai'i 387, 395, 879 P.2d 492, 500 (1994).

Relying on *State v. Tagaro,* 7 Haw.App. 291, 757 P.2d 1175 (1987), Moore argues that attempted reckless manslaughter is an included offense of attempted second degree murder and that, having found a "scintilla" of evidence of recklessness to support a reckless endangering instruction, the court was also required to instruct the jury on attempted reckless manslaughter.

In *Tagaro,* the ICA held that

the crime of attempted [reckless] manslaughter under the circumstances of this case is an included offense of attempted murder, and the trial court in the instant case was required to, sua sponte, instruct the jury that it could find Defendant guilty of that included offense if it did not find him guilty of attempted murder.

*Id.* at 297, 757 P.2d at 1179 (citation omitted).

Our recent decision in *State v. Holbron,* 80 Hawai'i 27, 904 P.2d 912 (1995), however, disposes of Moore's argument. In *Holbron,* we unequivocally overruled *Tagaro* and held that, under the Hawai'i Penal Code, there can be no offense of attempted reckless manslaughter. *Holbron,* 80 Hawai'i at 45, 904 P.2d at 930. Attempted reckless manslaughter is not, therefore, an included offense of attempted second degree murder. The failure *sua sponte* to instruct the jury on attempted reckless manslaughter, therefore, was not error.

### 2. Extreme Mental or Emotional Disturbance Manslaughter

 HRS § 707-702(2) (1993) provides, in pertinent part that:

In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he [or she] caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation.

Extreme mental or emotional disturbance is also a mitigating defense to attempted murder. *Holbron,* 80 Hawai'i at 45, 904 P.2d at 930; *State v. Nizam,* 7 Haw.App. 402, 771 P.2d 899, *cert. denied,* 70 Haw. 666, 796 P.2d 502 (1989). Thus, Moore was "entitled to an instruction on every defense or theory of defense having *any* support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive or unsatisfactory the evidence may be." *State v. Agrabante,* 73 Haw. 179, 196, 830 P.2d 492, 501 (1992) (emphasis in original) (quoting *State v. O'Daniel,* 62 Haw. 518, 527–28, 616 P.2d 1383, 1390 (1980)).

 We need not decide whether the trial court's failure to instruct the jury on the mitigating defense of attempted EMED manslaughter was plain error because the record in this case is entirely devoid of any evidence supporting a theory of attempted EMED manslaughter in the first instance. As the court stated in *State v. Russo,* 69 Haw. 72, 734 P.2d 156 (1987), " 'where evidentiary support for the asserted defense, or for any of its essential components, is clearly lacking, it would not be error for the trial court either to refuse to charge on the issue or to instruct the jury not to consider it.' " *Id.* at 76, 734 P.2d at 158 (quoting *State v. Horn,* 58 Haw. 252, 255, 566 P.2d 1378, 1380–81 (1977) (citation omitted)); *see also* HRS § 701–115(2) (1993) ("No defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented.").

Moore asserts that the testimony by police officers, describing him at the time of his arrest as "agitated," "nervous," "frantic," and "anxious," as well as the hearsay statements of Mrs. Moore to Officer Daniels that "I told him I was leaving" and "[h]e's distraught" constitute substantial evidence supporting a finding that Moore was under the influence of an EMED. However, even if this evidence supported a conclusion that Moore was under the influence of an EMED when he was arrested, the relevant inquiry is whether he was under such influence at the time he shot Mrs. Moore and whether there was a reasonable explanation, viewed from Moore's standpoint, for the disturbance.

Only two people had any knowledge of Moore's state of mind *at the time he fired the shots,* and neither of them testified. Thus, there is no evidence of whether Moore was

under the influence of an EMED nor any evidence from which the jury could "view[ ] the subjective, internal situation in which [Moore] found himself and the external circumstances as he perceived them at the time, . . . and assess[ ] from that standpoint whether the explanation for his emotional distress was reasonable[.]"[8] *State v. Dumlao,* 6 Haw.App. 173, 184, 715 P.2d 822 (citation omitted), *cert. denied,* 68 Haw. 692, 715 P.2d 822 (1986), *overruled in part by State v. Seguritan,* 70 Haw. 173, 766 P.2d 128 (1988).[9]

Moore's subsequent "agitation" or "nervousness," when trying to convince the police that Mrs. Moore had been shot by an "oriental male robber" or when being placed under arrest, simply does not support a theory of EMED manslaughter. We therefore hold that there was no error in failing to instruct the jury on attempted EMED manslaughter because there was absolutely no evidentiary support for the mitigating defense.

### 3. Other Offenses

■ On November 22, 1995, following our decision in *Holbron,* Moore filed a motion for leave to file an amended brief "modifying his first point on appeal (and the argument in support thereof) by urging reversal if [sic] his attempted murder conviction because Judge Aiona's [sic] violated *State v. Kupau* and failed to speak with defendant about included offenses or tender instructions for First Degree Assault[10] and Second Degree Assault.[11]" The motion was denied. We are not, however, precluded from addressing the issue.

Assuming, without deciding, that assault in the first degree and assault in the second degree are lesser included offenses of attempted murder under HRS § 701–109(4) (1993),[12] we hold that Moore was not entitled to instructions on those offenses. *Kupau* makes clear that the trial court's duty to, *sua sponte,* instruct the jury on lesser included offenses applies only to those instructions "that are supported by the evidence." 76 Hawai'i at 395, 879 P.2d at 500. "The court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict

---

8. Mrs. Moore's statements to Officer Daniels that "I told him I was leaving him" and "[h]e's distraught," even if arguably related to Moore's state of mind at the time of the shooting, could not support consideration by the jury of EMED manslaughter. At defense counsel's request, the statements were admitted with a limiting instruction that the statements were "limited solely for the purposes of explaining and describing Lani Moore's then existing mental, emotional or physical condition." *See* Section II.D.1., *infra.*

9. In *Seguritan,* the court held that it was reversible error to instruct the jury that EMED manslaughter requires that the defendant be "exposed to an extremely unusual and overwhelming stress" because that provision does not appear in HRS § 707–702(2) and focuses on the quality of the stress rather than on the defendant's reaction. 70 Haw. at 174, 766 P.2d at 129. The disapproved language was drawn from *People v. Shelton,* 88 Misc.2d 136, 385 N.Y.S.2d 708, 717 (Sup.1976) and quoted in *Dumlao,* 6 Haw.App. at 181–82, 715 P.2d at 829. The remainder of *Dumlao's* analysis of EMED manslaughter remains good law. *See, e.g., State v. Matias,* 74 Haw. 197, 204–05, 840 P.2d 374, 378 (1992).

10. HRS § 707–710(1) (1993) provides that "[a] person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person."

11. HRS § 707–711(1) (1993) provides in pertinent part that:

A person commits the offense of assault in the second degree if:
(a) The person intentionally or knowingly causes substantial bodily injury to another;
(b) The person recklessly causes serious bodily injury to another person;
. . . .
(d) The person intentionally or knowingly causes bodily injury to another person with a dangerous instrument[.]

12. HRS § 701–109(4) provides in relevant part as follows:

A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:
(a) It is established by proof of the same or less than all the same facts required to establish the commission of the offense charged; or
. . . .
(c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

acquitting the defendant of the offense charged and convicting the defendant of the included offense." HRS § 701–109(5).

The relevant distinction between attempted murder in the second degree, on the one hand, and assault in the first degree or assault in the second degree under HRS § 707–711(1)(a) or (d), on the other, is the result caused by Moore. Therefore, the only rational basis for a verdict acquitting Moore of attempted murder and convicting him of assault under HRS §§ 707–710, –711(1)(a), or –711(1)(d) would be evidence that it was not Moore's conscious object, see HRS § 702–206(1)(c) (1993), or that he was not aware that it was practically certain, see HRS § 702–206(2)(c) (1993), that his conduct would cause the death of Mrs. Moore, but, rather, that it was his conscious object or that he was aware that it was practically certain that his conduct would cause her only serious or substantial bodily injury. There is no evidence in the record, however, from which a reasonable juror could rationally infer that Moore contemplated a result other than Mrs. Moore's death.[13]

As outlined more fully in section II.B., *infra*, the evidence at trial established that Moore fired at least six shots at Mrs. Moore from point-blank range with a .32 caliber revolver, causing five gunshot wounds to her upper body, three of which were to vital areas. Further, the evidence supported the inferences that shots were fired at two distinct geographic locations and that Moore waited thirty minutes to get help for Mrs. Moore, during which time she lost approximately half of her blood volume while he made no attempt to administer first aid. There is, therefore, no rational basis in the evidence for a reasonable trier of fact to conclude that it was Moore's conscious object or that he was aware that it was practically certain that his conduct would cause only serious or substantial bodily injury to Mrs. Moore, rather than death.

Assault in the second degree, as defined by HRS § 707–711(1)(b), is committed when a person recklessly causes serious bodily injury to another. A rational basis in the evidence for a verdict acquitting Moore of attempted murder and convicting him of assault in the second degree under HRS § 707–711(1)(b) would require some evidence from which a reasonable juror could conclude that Moore was not at least aware that it was practically certain that shooting Mrs. Moore six times from point blank range with a .32 caliber revolver would cause her death, but that he merely "consciously disregard[ed] a substantial and unjustifiable risk" that repeatedly shooting her in the upper body would cause Mrs. Moore serious bodily injury. HRS § 702–206(3)(c) (1993). On the basis of the evidence presented at trial, we hold, as a matter of law, that a reasonable trier of fact could not so conclude.[14]

---

**13.** Even Moore acknowledges, in the context of his logic-defying argument on attempted reckless manslaughter, that "[m]anslaughter, like murder, involves intent to kill." If the State's evidence was believed, Defendant shot Mrs. Moore five times at close range. That evidence did not suggest a reckless *mens rea* aimed at "serious bodily injury." It was powerful evidence of an attempt to "recklessly cause the death of another person."

**14.** We recognize that, based on photographs showing a gunshot to the visor and a gunshot through the windshield, the trial court concluded that there was "a scintilla of evidence" of recklessness and instructed the jury on reckless endangering in the first and second degrees. There may very well have been a "scintilla of evidence" of recklessness; there was not, however, a rational basis in the evidence from which a reasonable trier of fact could conclude that Moore was not at least aware that it was practically certain that firing a gun at Mrs. Moore six times from point blank range would cause her death, and conclude, instead, merely that Moore consciously disregarded a substantial and unjustifiable risk that shooting Mrs. Moore repeatedly would place her in danger of death or serious bodily injury. *See* HRS §§ 707–713 and 707–714. Therefore, the instructions on reckless endangering were erroneously given.

The error, however, worked in Moore's favor and was harmless beyond a reasonable doubt. As we explained in *Holbron*,

in reaching a unanimous guilty verdict as to the charged offense of attempted murder in the second degree, the jury could not have reached, much less considered, the [reckless endangering] instruction[s] ... [so] there is no reasonable possibility that the error might have contributed to [Moore's] conviction.

80 Hawai'i at 47, 904 P.2d at 932 (citations, internal quotation marks and brackets omitted).

Consequently, Moore was not entitled to instructions on assault because the instructions were not supported by the evidence.

## B. *Prejudicial Opening Statement*

■ Moore argues that the prosecutor's opening statement deprived him of a fair trial because it referred to matters that, in light of Mrs. Moore's failure to testify, were never proven by the evidence. "Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. McGriff,* 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994) (citing *State v. Pemberton,* 71 Haw. 466, 476, 796 P.2d 80, 85 (1990)). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, we consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against the defendant." *Agrabante,* 73 Haw. at 198, 830 P.2d at 502 (citing *State v. Senteno,* 69 Haw. 363, 366, 742 P.2d 369, 372 (1987)).

■ Where the nature of the prosecutorial misconduct alleged is the failure of the prosecutor to prove or attempt to prove matters referred to in opening statements, a majority of jurisdictions place the burden on the defendant to show bad faith on the part of the prosecutor, unless the fundamental rights of the defendant were substantially prejudiced. *See* Annotation, *Prosecutor's Reference in Opening Statement to Matters Not Provable Or Which He Does Not Attempt to Prove as Ground for Relief,* 16 A.L.R.4th 810, 826–29 (1982 & Supp.1995) (listing jurisdictions and cases). These jurisdictions "implicitly recognize[ ] the uncertainty faced by any prosecutor at the outset of a trial in attempting to predict which evidence will be available to him [or her] and which items of the evidence will later be ruled inadmissible." *Id.* at 820.

■ Moore does not contend that the prosecutor acted in bad faith, or that his reference in his opening statement to Mrs. Moore's expected testimony, which was subsequently unavailable, was intended to apprise the jury of facts that would otherwise

be inadmissible. Adopting the majority standard, the issue is thus whether Moore's fundamental rights were substantially prejudiced. Resolution of this question requires an analysis of the opening statement and its relationship to the evidence adduced at trial.

*State v. Fisher,* 680 P.2d 35 (Utah 1984), provides a useful framework for the necessary inquiry. In *Fisher,* the defendant appealed the trial court's denial of his motion for mistrial that was brought when a witness, whose expected testimony was referred to in the prosecutor's opening statement, refused to testify. The defendant was convicted of second degree murder for the strangulation death of a prostitute whom the defendant believed was having an affair with his wife. The prosecutor represented, in his opening statement, that:

> [a witness] will testify that on several occasions after [the defendant's] wife had left him, [the defendant] had threatened the life of [the victim], making the statement that he felt if in fact he could do away with [the victim] that his wife … would come back to him. And he indicated to [the witness] on not one but several occasions different methods by which he would do away with [the victim] and that some of those ways included strangulation.

*Id.* at 36. Although the witness was under subpoena and was present in the courtroom at the time of the opening statement, he later refused to testify because of threats he had received from fellow inmates.

The court first explained the test as follows:

> Where the State does not produce a witness whose testimony was outlined during opening statement, we look at two factors to determine whether the conviction should be reversed. "The controlling question should be the good faith or lack of good faith of counsel in saying what he [or she] said in his [or her] opening statement and the likelihood that the opening statement was unfairly prejudicial to the defendant."

*Id.* (citations omitted). Because the good faith of the prosecutor in *Fisher* was not at issue, the court next considered whether the

defendant was prejudiced by the prosecutor's statements.

> The critical inquiry under this ground is whether the statements would have so influenced the jury that without them there was "a reasonable likelihood of a more favorable result for the defendant." That question turns on the nature of the statements and their relationship to the evidence introduced at trial.

*Id.* (citations omitted). The only disputed issue in *Fisher* was the defendant's intent. During opening statements, the prosecution informed the jury that the anticipated testimony of the witness (who later refused to testify) would show that the defendant had made threats against the victim's life, had a motive for killing her, and had planned the murder in advance. The only evidence of intent heard by the jury, however, was the testimony of another witness who indicated that the defendant had threatened to kill the victim. The court held that "there was ample independent, credible evidence to support a jury verdict ... that [the] defendant intended to kill [the victim]," *id.* at 37, and, thus, the defendant was not prejudiced. *See also State v. Benton,* 812 S.W.2d 736 (Mo.App.1991) (where neither defendant nor victim testified at trial, there were no eyewitnesses, and no weapon was found, defendant's rights were not substantially prejudiced by the prosecutor's reference in opening statement to anticipated testimony of victim; evidence against defendant was "strong," prosecutor acted in good faith, and defense had opportunity, in closing statement, to show that prosecution did not produce evidence it promised in opening).

Moore relies on *People v. Cruz,* 100 A.D.2d 882, 474 N.Y.S.2d 142 (1984), and *People v. Ware,* 13 A.D.2d 1015, 216 N.Y.S.2d 644 (1961), in which the New York Court of Appeals held that new trials were required because the prosecutor made references in opening statements to the expected testimony of co-defendants who did not testify. The court did not, in either case, discuss the state of the evidence against the defendant in any detail, but merely characterized it as "far from overwhelming," *Cruz,* 474 N.Y.S.2d at 144, and "close ... on the facts." *Ware,* 216 N.Y.S.2d at 646.

In the instant case, the record demonstrates that there was substantial evidence to support Moore's conviction. Moore's identity as the assailant was established by Mrs. Moore's former testimony. The fact that Moore intended to cause the death of Mrs. Moore can be reasonably inferred from the evidence. First, the testimony of the treating physician established that there were five gunshot wounds to Mrs. Moore's upper body, three to vital areas. Second, there was evidence from which the jury could have reasonably inferred that shots were fired at two separate locations. Two Diamond Head Circle residents testified that, at about 9:30 p.m., they heard four shots over a span of about ten seconds, punctuated by a woman's screams.[15] The physical evidence demonstrated that at least six shots had been fired. The surgeon who treated Mrs. Moore in the emergency room testified that Mrs. Moore sustained five gunshot wounds. Metal fragments were visible in the x-rays in the vicinity of each wound, and one bullet was recovered intact from beneath Mrs. Moore's skin. Detective Charles Davis testified that one shot was fired from within the vehicle out through the windshield and that one other intact bullet[16] and several other fragments were recovered from within the vehicle. Thus, the jury could have reasonably inferred that four shots had been fired at the Diamond Head Circle location and that the remaining shots had been fired at some other location.

There was also independent evidence from which the jury could reasonably have inferred that Moore drove around for thirty

---

**15.** Although the defense moved to strike this testimony, claiming that there was nothing to tie the shots to Moore, the court denied the motion. Officer Tong had testified that Moore told him the shooting had occurred by Unity Church, and Moore's wallet was later found on the 'Ewa side of Diamond Head Circle, near Unity Church.

**16.** The bullets that were intact were later identified by HPD Detective Charles Davis as lead, round-nose .32 caliber Smith & Wesson long revolver bullets.

minutes rather than seek help for Mrs. Moore. The record indicates that thirty minutes had elapsed between the time the initial shots were heard and the time that Moore approached Officers Daniels and Tong. Also, there was testimony about the near-total absence of blood on Moore's hands and clothing and the unused first-aid kit in the car, from which it could be reasonably inferred that Moore made no effort to help his wife. Moreover, the treating physician testified that Mrs. Moore had lost half of her blood volume by the time she was brought to the hospital. Thus, there was strong independent evidence that Moore had shot Mrs. Moore and did so with the intent to cause her death, which was all the jury needed to find in order to convict Moore of attempted second degree murder.[17]

Our review of the evidence against Moore, in relation to the nature of the prosecutor's opening statement, leads us to the conclusion that there is no reasonable likelihood that the result of the trial would have been favorable to Moore had the jury not heard the remarks in the opening statement. Our conclusion is further supported by the repeated instructions to the jury that the attorneys' comments were not evidence.[18] *See e.g., Holbron,* 80 Hawai'i at 46, 904 P.2d at 931 (jury is presumed to have followed instructions given by the court).

Finally, defense counsel had the opportunity in closing argument to call the juror's attention to the prosecution's failure to produce evidence promised in its opening statement. In fact, the prosecutor specifically requested a ruling on whether defense counsel could argue that the prosecutor did not produce evidence promised in his opening statement, and the court stated that "[defense counsel] can argue what the evidence has failed to show."

Because the prosecutor's opening statement was made in the good faith belief that Mrs. Moore would be available to testify at trial and in light of the substantial evidence against Moore and the court's curative instructions, we hold that Moore's fundamental rights were not substantially prejudiced by the references in the prosecutor's opening statement to anticipated testimony that was not offered at trial.

### C. *Sufficiency of Complaint*

Moore argues that his motions to dismiss the complaint and for arrest of judgment were erroneously denied because the complaint failed to state a cause of action for attempted murder, and, therefore, the court lacked jurisdiction to enter the guilty verdicts. The sufficiency of the complaint is a question of law, which we review *de novo. See State v. Israel,* 78 Hawai'i 66, 890 P.2d 303 (1995). The applicable criteria are: (1) whether the charge contains the elements of the offense intended to be charged and sufficiently apprises the defendant of what he or she must be prepared to meet; and, (2) in the event any other proceedings are taken against the defendant for a similar offense,

---

17. Of the remaining remarks in the opening statement, none was so prejudicial as to require reversal, and none provided missing facts required to prove an element of the offense. Evidently, Moore did not believe that the comments about the school, career, and marital history of the Moores was prejudicial because defense counsel's own opening statement paralleled much of what was said by the prosecutor. The prosecutor also stated in his opening that Mrs. Moore begged Moore to take her to the hospital and that he refused to do so until she agreed to corroborate his "oriental male robber" story. There is no reasonable likelihood that, absent these statements, the result would have been favorable to Moore, given the fact that there was already evidence before the jury that he did not take her to the hospital and that he had told police that she had been shot by an oriental male robber.

18. Immediately before the prosecutor gave his opening statement, the court stated, "Good morning, counsel. Good morning, ladies and gentlemen of the jury. At this point in time, we'll have opening arguments. Again, I remind you, what the attorneys say is not evidence; and, as such, [Prosecutor], you may proceed." Again, preceding the closing arguments, the court cautioned the jury, stating, "Let me just remind you once again, ladies and gentlemen of the jury, that what the attorneys say or comment on the law and what they say—what they say or comment on the evidence is not evidence and it's up to you to determine what the evidence is." After closing arguments, the court's instructions to the jury included the following: "Statements or remarks made by counsel are not evidence. You should consider their arguments to you but you are not bound by their recollections or interpretations of the evidence."

216

whether the record accurately reflects the extent to which he or she may plead a former acquittal or conviction. *Id.* at 70, 890 P.2d at 307; *see also State v. Torres,* 66 Haw. 281, 289, 660 P.2d 522, 527 (1983); *State v. Daly,* 4 Haw.App. 52, 54–55, 659 P.2d 83, 85 (1983).

Count I of the October 11, 1993 amended complaint, in language identical to that of the original complaint, charged Moore in pertinent part as follows:

> COUNT I: On or about the 7th day of January, 1992, in the City and County of Honolulu, State of Hawaii, ROBERT STEVEN MOORE did intentionally engage in conduct which is a substantial step in a course of conduct intended or known to cause the death of Lani Moore, thereby committing the offense of Attempted Murder in the Second Degree, in violation of Section[s] 705–500, 707–701.5(1) and 706–656 of the Hawaii Revised Statutes.

The language of the complaint is drawn from HRS § 705–500(2), which defines a criminal attempt as follows:

> When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he [or she] intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

*Id.*

■ "Where the statute sets forth with reasonable clarity all essential elements of the crime intended to be punished, and fully defines the offense in unmistakable terms readily comprehensible to persons of common understanding, a charge drawn in the language of the statute is sufficient." *State v. Jendrusch,* 58 Haw. 279, 283, 567 P.2d 1242, 1245 (1977) (citations omitted); *see also State v. Schroeder,* 76 Hawai'i 517, 529, 880 P.2d 192, 204 (1994) ("[C]harges will not be found to be defective where the record demonstrates that they tracked the relevant statutory language and that the defendant clearly understood the accusations and mounted a viable defense at trial.") (Citing *State v. Cadus,* 70 Haw. 314, 318–19, 769 P.2d 1105,

1108–09 (1989)). Count I of the amended complaint tracks the applicable language of HRS § 705–500(2) virtually verbatim, adding only the defendant's name and substituting "the death of Lani Moore" for "such a result."

A conclusion that the complaint omitted the intent element of attempted second degree murder would thus be tantamount to a conclusion that HRS § 705–500(2) does not set forth with reasonable clarity all of the essential elements of attempt liability, or, alternatively, that the specific intent to cause a result is not an essential element of a criminal attempt when causing a particular result is an element of the crime. Neither conclusion is correct.

The complaint alleged that Moore "*intentionally* engage[d] in conduct ... *intended or known* to cause the death of Lani Moore[.]" (Emphasis added.) Although the phrase "intended or known" describes the conduct, implicit in the sentence is that the conduct was intended or known *by Moore,* the subject of the sentence, to cause the death of Lani Moore. The fact that the intent to kill Mrs. Moore was alleged indirectly does not render the complaint defective:

> No indictment or bill of particulars is invalid or insufficient for the reason merely that it alleges indirectly and by inference instead of directly any matters, facts, or circumstances connected with or constituting the offense, provided that the nature and cause of the accusation can be understood by a person of common understanding.

HRS § 806–31 (1993). Although the language of the complaint, which, as previously noted, tracked virtually verbatim the language of the statute, is concededly awkward, it does set forth with reasonable clarity all of the elements of the offense. Count I charged Moore with intentionally engaging in conduct that he intended or knew would cause Mrs. Moore's death. A person of common understanding, reading the language of Count I, would understand that the nature of the accusation was that Moore intended to cause the death of Mrs. Moore.

## D. *Confrontation Clause and Hearsay*

Moore complains that the admission of HPD Officer Daniels's testimony regarding Mrs. Moore's statements and Mrs. Moore's former testimony was an abuse of discretion and violated his constitutional right to confront and cross-examine his accuser.

▇ In *Kealoha v. County of Hawaii,* 74 Haw. 308, 844 P.2d 670, *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993), we explained that

> different standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.

*Id.* at 319, 844 P.2d at 676. The requirements of the rules dealing with hearsay are such that application of the particular rules can yield only one correct result. HRE Rule 802 (1993) provides in pertinent part that "[h]earsay is not admissible except as provided by these rules[.]" HRE Rules 803 and 804(b) (1993) enumerate exceptions that "are not excluded by the hearsay rule[.]" With respect to the exceptions, the only question for the trial court is "whether the specific requirements of the rule were met, [so] there can be no discretion." *Kealoha,* 74 Haw. at 319, 844 P.2d at 675. Thus, where the admissibility of evidence is determined by application of the hearsay rule, there can be only one correct result, and "the appropriate standard for appellate review is the right/wrong standard." *Id.*

### 1. Mrs. Moore's statement to Officer Daniels

As previously indicated, Officer Daniels testified that, while waiting for the ambulance, Mrs. Moore stated that "[h]e [ (referring to Moore) ] shot me," "[h]e's a good man. I told him I was leaving him. He's distraught[,]" and "[k]eep him away from me . . . get him away from me." The jury was given a limiting instruction that Daniels's testimony regarding Mrs. Moore's statement "is limited solely for the purposes of explaining and describing Lani Moore's then existing physical, mental, or emotional condition." Moore argues that the circuit court erroneously admitted the statements made by Mrs. Moore to Officer Daniels under HRE Rule 803(b)(3), which excepts from the hearsay rule

> statement[s] of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Moore contends that, as "statements of memory or belief," Mrs. Moore's statements were expressly excluded by the language of HRE Rule 803(b)(3).[19] However, we need not decide whether the statements were erroneously admitted under the 803(b)(3) exception because, despite the court's ruling, if there was error, it was harmless beyond a reason-

---

**19.** Moore also argues on appeal that Mrs. Moore's then existing, mental, emotional or physical condition was irrelevant. We agree. HRE Rule 401 (1993) defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Mrs. Moore's emotional and mental condition were not facts of consequence to the determination of Moore's guilt. To the extent that her physical condition was at issue, the probative value of the statements should have been balanced against the prejudicial value, pursuant to HRE Rule 403. As the commentary to HRE Rule 105, on limited admissibility, notes:

> Determination of limited admissibility under this rule, therefore, involves a careful balance between the value of the evidence, in terms of the limited purpose for which it is admissible, and the danger of prejudice occasioned by possible consideration of the evidence by the jury for improper purposes in disregard of the limiting instruction. As the Advisory Committee's Note to Fed.R.Evid. 105 puts it: "A close relationship exists between this rule and Rule 403." The rule recognizes the necessity for discretionary judicial exclusion of such evidence when the danger of prejudice is great. *Cf. Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

able doubt because the circuit court was wrong in concluding that the statements were inadmissible under the "excited utterance" exception.

The prosecution argued that Mrs. Moore's hearsay statements to Officer Daniels were admissible under both the "present sense impression" and "excited utterance" exceptions. HRE Rule 803 (1993) provides in relevant part that:

The following are not excluded by the hearsay rule even though the declarant is available as a witness:

. . .

(b) Other exceptions.

(1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter.

(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

Rules 803(b)(1) and 803(b)(2) are identical to the Federal Rules of Evidence (FRE) Rules 803(1) and 803(2), and codify part of the *res gestae* exception to hearsay recognized by the common law. *See* Commentary to HRE Rules 803(b)(1) and 803(b)(2). Although the two rules have some overlap, the Advisory Committee's Note to FRE Rules 803(1) and 803(2) explains the differing rationales and applications:

The underlying theory of Exception (1) is that substantial contemporaneity of event and statement negative the likelihood of deliberate or conscious misrepresentation. . . . The theory of Exception (2) is simply that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication. 6 Wigmore § 1747. p. 135. Spontaneity is the key factor in each instance, though arrived at by somewhat different routes.

. . . .

With respect to the time element, Exception (1) recognizes that in many, if not most, instances precise contemporaneity is not possible, and hence a slight lapse is allowable. Under Exception (2) the standard of measurement is the duration of the state of excitement.

■ Mrs. Moore's statements to Officer Daniels were not contemporaneous with the event she was describing and, thus, do not fall within the present sense impression exception. The statements, however, were admissible as excited utterances, if they were made under the stress of excitement.

■ "The assumption underlying [the excited utterance] exception is that a person under the sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication and that, consequently, any utterance will be spontaneous and trustworthy." 4 J.B. Weinstein & M.A. Berger, *Weinstein's Evidence*, ¶ 803(2)[01], at 803–101 (1994). "[L]ack of capacity to fabricate, rather than lack of time to fabricate is the justification for this rule." *Id.* at 803–105.

The basis for the "excited utterance" exception, . . . is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous.

*Idaho v. Wright,* 497 U.S. 805, 820, 110 S.Ct. 3139, 3149, 111 L.Ed.2d 638 (1990) (citations omitted).

■ Three foundational requirements are imposed by HRE Rule 803(b)(2) and recognized by courts applying identical rules. The proponent of the statement must establish that: (1) a startling event or condition occurred; (2) the statement was made while the declarant was under the stress of excitement caused by the event or condition; and (3) the statement relates to the startling event or condition. *See, e.g., United States v. Sowa,* 34 F.3d 447, 452–53 (7th Cir.1994); *United States v. Moore,* 791 F.2d 566, 570 (7th Cir.1986); *State v. Whalen,* 520 N.W.2d 830, 831–32 (N.D.1994); *State v. McLaughlin,* 642 A.2d 173, 175 (Me.1994); *see also* 2

*McCormick on Evidence* § 272 at 215–16 (4th ed. 1992); M.H. Graham, *Federal Practice and Procedure* § 6753 at 571 (interim ed. 1992).

■ In this case, the circuit court ruled that the first foundational requirement was not satisfied, that is, that

there was a lack of foundation in establishing, initially, whether the event occurred. And then the chain of events, at that point in time, were not established. So, as such, the Court will sustain the objection.

In this case, I do have a lack of foundation as to whether the events actually occurred.

We disagree. Before the hearsay statements were offered, Officer Daniels had testified that on January 7, 1992, she and Officer Tong were preparing to depart from an alarm call when a white car pulled up with its horn honking and headlights flashing. Moore got out and approached Officer Tong, yelling something that Officer Daniels could not make out. After Officer Daniels approached the two men, "[Moore] spoke with Officer Tong and myself and said someone had shot his wife." When Officer Daniels approached the white car, she saw Mrs. Moore in the passenger seat and a large hole in the windshield on the passenger side of the vehicle. Officer Daniels recounted that when she got closer, she observed that "[t]here was blood on the front of [Mrs. Moore's] white-colored shirt from the upper chest area down to the waistline."

The circuit court's ruling that this was insufficient to establish the foundational fact that a startling event or condition had occurred is inexplicable and wrong. *Cf. State v. Ortiz,* 74 Haw. 343, 359–60, 845 P.2d 547, 555 (1993) (extrinsic evidence that declarant was crying and holding her face established existence of startling event). Officer Daniels's testimony regarding Moore's statement that "someone shot my wife," and the fact that Mrs. Moore was bleeding extensively established, beyond dispute, a startling event or condition. There is also no question that Mrs. Moore's statements to Officer Daniels related to the startling event or condition. We therefore focus on the second and most crucial requirement—whether the statement was made under the stress of excitement caused by the startling event or condition.

"In all cases, the ultimate question is whether the statement was the result of reflective thought or whether it was rather a spontaneous reaction to the exciting event." 2 *McCormick on Evidence* § 272 at 218. The temporal relationship between the event and the statement is certainly a factor to consider when determining whether the declarant is still influenced by the stress of the event. Our recent case law, however, insofar as it suggests that the time interval between the event and the statement is a foundational precondition to admissibility, is inconsistent with the rule itself, earlier precedent, and the overwhelming weight of authority from other jurisdictions considering the identical rule. It is therefore worth examining how our interpretation of the excited utterance exception has evolved to the point where, rather than looking to a short time interval between event and statement as an indicator that the declarant was still excited by the event, the ICA, in *State v. Dunn,* 8 Haw.App. 238, 246, 798 P.2d 908, 912 (1990), pointed to the fact that the declarant was "crying and visibly upset" to establish that the event had occurred only a short time before the statement was made.

In *Territory v. Kinoshita,* 38 Haw. 335 (1949), the appellant asserted that the trial court erred in allowing a child's statements to her mother to be admitted as a spontaneous declaration because, *inter alia,* they were made as much as two and a half hours after the event. Notwithstanding that the time of the startling event had not been established at trial prior to the admission of the statement, the court held that the statements were admissible as spontaneous declarations, explaining that:

the element relating to the time when such statements were made is but one of the factors entering into the determination as to whether declarations were spontaneous, natural, impulsive, instinctive, generated by an excited feeling which extends without let or breakdown from the moment of the event they illustrate.

*Id.* at 342 (footnote and internal quotation marks omitted).

In *Territory v. Lewis,* 39 Haw. 635 (1953), the court again explained the role of the time interval between the event and the spontaneous declaration where, again, the duration of time between the event and the statement was not established:

> "... We have examined a large number of authorities upon the abstract propositions involved in the rules on which testimony is received or not received as part of the *res gestae.* These authorities satisfy us that the close connection in time between the statements or declaration and the act of which it is said to be a part is an element for consideration; that being close in point of time is not, however, all of the basis for receiving such evidence, and that the ultimate test is spontaneity or instinctiveness and logical relation to the main event; that the tendency of the modern cases is to be liberal in the reception of such testimony." [quoting *Solice v. State,* 21 Ariz. 592, 193 Pac. 19, 20 (1920).]
>
> Fundamentally, the sound rule is that, in order for statements to be admitted as part of the *res gestae,* the statements must be reasonably contemporaneous with the event to which they relate, *i.e.,* they must be such as to have been proximately caused by the exciting influence of the event without opportunity for deliberation or influence. (*Territory v. Kinoshita,* 38 Haw. 335 (1949)).

*Id.* at 640. The rule formulated in *Lewis* requires that the event and the statement be "reasonably contemporaneous" and defines that term not as a bright-line time limit, but in terms of the causative link between the event and the statement. In other words, the statement is "reasonably contemporaneous" with the event if it was a spontaneous reaction to the exciting event rather than by deliberation or other influence.

This rule, however, has apparently been misunderstood. In *State v. Messamore,* 2 Haw.App. 643, 639 P.2d 413 (1982), the ICA quoted the *Lewis* rule as authority for the proposition that "the authorities and the case law are concerned that the time span between the event and the making of the statement is short—very short." *Id.* at 649, 639 P.2d at 418. This ill-supported observation was transformed into a foundational requirement for the applicability of the excited utterance exception in *Shea v. City & County of Honolulu,* 67 Haw. 499, 692 P.2d 1158 (1985), wherein this court stated: "Because the 'element that buttresses the reliability of [an 'excited utterance'] is ... spontaneity[,] ... the time span between the event and the making of the statement [must be] short—very short.'" *Id.* at 506, 692 P.2d at 1164 (brackets and ellipsis points in original) (quoting *Messamore,* 2 Haw.App. at 649, 639 P.2d at 418).

The court, in *In the Interest of John Doe, born on November 23, 1970,* 70 Haw. 32, 761 P.2d 299 (1988), recited the original rule from *Lewis,* adding the *Shea* requirement, and stated:

> " 'To be admitted[, statements] must be reasonably contemporaneous with the event to which they relate, *i.e.,* they must be such as to have been proximately caused by the exciting influence of the event without opportunity for deliberation or [other] influence.' " *Shea v. City & County,* 67 Haw. 499, 506, 692 P.2d 1158, 1164 (1985) (quoting *Territory v. Lewis,* 39 Haw. 635, 640 (1953)) (citations omitted). Essentially, the time span between the event and the declaration must be short. *State v. Messamore,* 2 Haw.App. at 649, 639 P.2d at 418.

*Id.* at 38–39, 761 P.2d at 303. Then, in *State v. Beyer,* 72 Haw. 469, 822 P.2d 519 (1991), the court relied on a commentator's interpretation of *In the Interest of John Doe* to establish the foundational requirements of the excited utterance exception:

> In A. Bowman, *Hawaii Rules of Evidence Manual* § 803–2B(2), at 341 (The Michie Co.1990), the author states, with respect to the excited utterance exception to the hearsay rule:
>
> > Foundation requirements, according to the court in [*In the Interest of John Doe,* 70 Haw. 32, 38, 761 P.2d 299, 303 (1988) ], are (1) that the statement be "reasonably contemporaneous" with the event, (2) that the statement "have been proximately caused" by the excitement

generated by the event; and (3) that the statement have been made "without opportunity for deliberation or [other] influence." The court added: "Essentially, the time span between the event and the declaration must be short." [Citation omitted.]

*Id.* at 472, 822 P.2d at 521 (brackets in original).

Most recently, in *State v. Ortiz,* 74 Haw. 343, 845 P.2d 547 (1993), we stated that, "[i]n evaluating whether a statement was made while the declarant was under the stress of excitement caused by an event, the time span must be very short." *Id.* at 358, 845 P.2d at 554 (citing *Shea* and *Messamore* ).

The overwhelming weight of authority from other jurisdictions holds that a short time interval between the startling event and the excited utterance is not an independent foundational requirement that must be satisfied to come within the excited utterance exception. *See e.g., Sowa,* 34 F.3d at 453 (time element important but not controlling; statement twenty minutes after event admissible); *State v. Patino,* 177 Wis.2d 348, 502 N.W.2d 601, 608 (App.1993) (time lapse measured by duration of excited condition rather than time lapse from event described; statement made one hour after event admissible); *Ross v. State,* 879 S.W.2d 248, 249 (Tex.App. 1994) (time between event and statement is not the critical factor, where declarant under stress of event thirty to forty-five minutes later; statement admissible); *People v. Knade,* 252 Ill.App.3d 682, 192 Ill.Dec. 212, 216, 625 N.E.2d 172, 176 (1993) (time factor is elusive and variable element dependent on facts of case; statement one hour after event admissible); *United States v. Rivera,* 43 F.3d 1291, 1296 (9th Cir.1995) (time lapse not dispositive in application of [Federal Rules of Evidence] Rule 803(2); statement more than one-half hour after event admissible); *Moore,* 791 F.2d at 572 (lapse of time between statement and event not dispositive; statement admissible even where time element not established but where declarant "very excited"); *Webb v. Lane,* 922 F.2d 390, 394 (7th Cir.1991) ("well established law" in circuit that amount of time between event and statement is not dispositive; statement must be made contemporaneously with excitement, not contemporaneously with event; statement one to two hours after event admissible); *United States v. Iron Shell,* 633 F.2d 77, 85 (8th Cir.1980) (lapse of time between startling event and statement is relevant but not dispositive; statement made between forty-five minutes and one hour fifteen minutes after the event admissible); *People in Interest of O.E.P.,* 654 P.2d 312, 318 (Colo.1982) (temporal interval not conclusive on question of admissibility; statement made by child almost twenty-four hours after event admissible).

The elapsed time is certainly a relevant consideration in the determination; a statement made within minutes of a startling event can often fairly be characterized as the product of excitement rather than of deliberation. Because the converse is not necessarily true, however, most courts look at factors other than the mere passage of time to determine whether a statement was made while the declarant was still under the influence of the startling event. Among the factors frequently recited are the nature of the event, the age of the declarant, the mental and physical condition of the declarant, the influences of intervening occurrences, and the nature and circumstances of the statement itself. *See, e.g., McLaughlin,* 642 A.2d at 175; *Iron Shell,* 633 F.2d at 86; *Rivera,* 43 F.3d at 1296; *People v. Fomond,* 273 Ill. App.3d 1053, 210 Ill.Dec. 346, 351, 652 N.E.2d 1322, 1327 (1995); 2 *McCormick on Evidence* § 272 at 219; Graham, *Federal Practice and Procedure,* at 573.

In light of the above discussion, we hold that a "very short" time interval between a startling event and an excited utterance, although a factor in the determination, is not a foundational prerequisite to the admissibility of the statement under HRE Rule 803(b)(2). Therefore, the fact that the time interval between the shooting and Mrs. Moore's statements to Officer Daniels was not established at the time the statements were offered is not dispositive of whether the statement was made while Mrs. Moore was still under the stress of excitement caused by the shooting. Consequently, we look to other factors, such as the nature

of the event and the physical condition of Mrs. Moore.

In *Webb*, the court considered statements made in the emergency room by a shooting victim between one and two hours after the shooting. *Id.* at 393–95. The court held that the statements were properly admitted where they "followed an extremely violent experience, being shot six times," and the victim appeared to be in pain. *Id.* at 394 (citing *Puleio v. Vose*, 830 F.2d 1197, 1207 (1st Cir.1987) (" '[t]he remark followed ... a shooting—likely to produce the utmost in excitement and shock ... ensur[ing] the utterance's spontaneity....' ")). "Physical factors such as pain may serve to prolong the period in which the risk of fabrication is reduced to an acceptable minimum." *Id.* (quoting *Smith v. Fairman*, 862 F.2d 630, 636 (7th Cir.1988), *cert. denied*, 490 U.S. 1008, 109 S.Ct. 1645, 104 L.Ed.2d 160 (1989)).

In *People v. House*, 141 Ill.2d 323, 152 Ill.Dec. 572, 566 N.E.2d 259 (1990), the court employed similar reasoning when considering the statement of a woman that had been given two and one-half hours after she had witnessed two murders and had herself been set ablaze, sustaining severe burns over forty percent of her body. "Even though the only testimony as to her condition at the time of her hospital statement was ... that she appeared to be in pain, and even though ... she was alert and responsive, we believe it is inconceivable that [the declarant] spent the intervening time ... fabricating a story to tell police. The very nature of her injuries was such that the injuries undoubtedly commanded her full attention." *Id.* 152 Ill.Dec. at 599–600, 566 N.E.2d at 286–87; *see also Ross*, 879 S.W.2d at 249 (where victim had been shot in chest and hip four times, her statement thirty to forty-five minutes later was admissible because, "[g]iven the severity of her injuries, we believe that [declarant] was dominated by the emotions, excitement, fear, and pain of the event at the time she made both statements"); *Knade*, 192 Ill.Dec. 212, 625 N.E.2d at 176 ("We find it inconceivable that the victim, suffering from such serious injuries and associated blood loss, would concoct a fabrication during the span of approximately [one] hour such that the

spontaneity of his statements would be destroyed.").

Officer Daniels testified that Mrs. Moore was covered with blood from her upper chest to her waistline, was holding her hand flat to her chest, and was perspiring. Her voice was barely audible. It was later established that the shooting had occurred within the previous half hour, that Officer Daniels was the first person, other than Moore, to whom Mrs. Moore had spoken after the shooting, and that Mrs. Moore had a collapsed lung and had lost approximately fifty percent of her blood volume by the time she had arrived at the hospital a short time later.

Under the totality of the circumstances in this case, particularly the violent nature of the startling event and the severity of her injuries, we conclude that Mrs. Moore's statements to Officer Daniels were made while Mrs. Moore was under the stress of excitement caused by the shooting and that the statements were not the product of reflective thought.

Because the three foundational requirements of HRE 803(b)(2) were established, we hold that the statements were substantively admissible under the hearsay exception for excited utterances. The fact that the statements may have been erroneously admitted for a limited purpose was therefore harmless beyond a reasonable doubt.

### 2. Mrs. Moore's Former Testimony

██ Moore argues that, under HRE Rule 804(b)(1), the admission of Mrs. Moore's former testimony was erroneous and violated his right to confrontation under the United States and Hawai'i Constitutions. The sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution guarantee an accused the right to confront adverse witnesses. "The confrontation clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him [or her], and the right to conduct cross-examination." *State v. Apilando*, 79 Hawai'i 128, 131, 900 P.2d 135, 138 (1995) (quoting *Coy v. Iowa*, 487 U.S. 1012, 1017, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857 (1988)) (internal quotation marks omitted).

While a literal interpretation of the confrontation clause could bar the use of any out-of-court statements when the declarant is unavailable, this Court has rejected that view as "unintended and too extreme." Rather, we have attempted to harmonize the goal of the Clause—placing limits on the kind of evidence that may be received against a defendant—with a societal interest in accurate factfinding, which may require consideration of out-of-court statements.

*State v. McGriff,* 76 Hawai'i 148, 156, 871 P.2d 782, 790 (1994) (quoting *Bourjaily v. United States,* 483 U.S. 171, 182, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987)).

▉ Following *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), this court has repeatedly recognized that

the confrontation clause restricts the range of admissible hearsay in two ways. First, the prosecution must either produce, or demonstrate the unavailability of, a declarant whose statement it wishes to use against a defendant. Second, upon a showing that the witness is unavailable, only statements that bear adequate indicia of reliability are admissible.

*Ortiz,* 74 Haw. at 361, 845 P.2d at 555–56 (citing *Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538–38); *see also McGriff,* 76 Hawai'i at 156, 871 P.2d at 790; *Apilando,* 79 Hawai'i at 131, 900 P.2d at 139–40.

"A showing of the declarant's unavailability is necessary to promote the integrity of the fact finding process and to ensure fairness to defendants." *Ortiz,* 74 Haw. at 362, 845 P.2d at 556. In *Ortiz,* we described the requirements for establishing unavailability of a declarant:

To demonstrate the unavailability of a declarant at trial, the prosecution must show that it made a good faith attempt to secure his or her presence. To establish this good faith attempt, the prosecution must confirm on the record at the time of trial both the declarant's unavailability and that vigorous and appropriate steps were taken to procure the declarant's presence at trial.

*Id.* at 363, 845 P.2d at 556–57 (citing *State v. Rodrigues,* 7 Haw.App. 80, 86, 742 P.2d 986, 990 (1987)).

In *State v. White,* 65 Haw. 286, 288, 651 P.2d 470, 472 (1982), we held that the unavailability requirement was satisfied, for purposes of the confrontation clause, where the prosecution confirmed on the record that it had assigned an investigator to locate a witness with no known job, address, or telephone number, and the investigator contacted the witness's mother and had other officers check locations where the witness was thought to have once resided. We have also held that unavailability was established where the prosecution: (1) attempted four times to serve a subpoena; and (2) subsequently assigned an investigator, who (a) checked the witness's driver's license number and motor vehicle registration, (b) ran checks on voter registration records and phone listings, (c) contacted the witness's last known residence and work place, and (d) interviewed his former neighbors, who indicated that the witness may have moved to Alaska. *State v. Bates,* 70 Haw. 343, 346, 771 P.2d 509, 511 (1989).

Where the prosecution failed to establish on the record at trial that it had made a good faith effort to secure the presence of the declarant at trial, we have held that the admission of a hearsay statement, even if under an exception, was a violation of the defendants' rights to confrontation. In *State v. Beyer,* 72 Haw. 469, 473, 822 P.2d 519, 521 (1991), we recognized that

it is true that mere absence of the complaining witness, where there have been vigorous and appropriate steps to procure the complaining witness'[s] presence at trial, does not necessarily constitute a violation of the right of confrontation if the out-of-court statements of the complaining witness have been made in such circumstances as to be so reliable that cross-examination does not appear necessary or there has been an opportunity for cross-examination[.]

*Id.* at 473, 822 P.2d at 521 (citation omitted). We held, however, that "[m]ere service of a subpoena on the complaining witness did not establish [the witness's] unavailability," *id.,*

and that the witness's out-of-court statements were not admissible where they did not come within a hearsay exception and were not sufficiently trustworthy as to eliminate the need for cross-examination. *Id.; see also Ortiz,* 74 Haw. at 363, 845 P.2d at 556–57 (admission of declarant's statement under hearsay exception violated defendant's right to confrontation where prosecution failed to issue a trial subpoena and failed to make showing of declarant's unavailability); *State v. Kim,* 55 Haw. 346, 350, 519 P.2d 1241, 1244 (1974) (prosecution did not sufficiently establish unavailability by showing that witness had forwarding address in another state where no attempt made to secure witness's presence); *Rodrigues,* 7 Haw.App. at 87–88, 742 P.2d at 991 (defendant's right to confrontation violated where prosecution established at hearing, on the eve of trial, that witness was unavailable despite efforts to secure the witness's presence, but failed to reaffirm unavailability on record at trial).

■ The record in this case reveals that the prosecution established, through direct and cross-examination, Mrs. Moore's unavailability and its good faith efforts to secure her presence. Mrs. Moore was under subpoena for trial beginning November 22, 1993. The prosecutor spoke with Mrs. Moore in the preceding week, and she acknowledged that she was under subpoena and would testify. Nonetheless, an investigator for the prosecution had made seven attempts to serve another subpoena over the weekend before Mrs. Moore was to testify. After the investigator was informed by the Moores' nanny that Mrs. Moore had left the state, the prosecutor began calling names from the defense's witness list in an attempt to locate her. He learned that she had been at her brother-in-law's home in California, but had left earlier the same day, December 5, 1993, without disclosing her destination.

Moore urges, citing *United States v. Lynch,* 499 F.2d 1011, 1023 (D.C.Cir.1974), that the prevailing standard is that to establish the prosecution's reasonable efforts to secure the presence of the declarant "will require a search equally as vigorous as that which the government would undertake to find a critical witness if it has no prior testimony to rely upon[.]" We do not disagree with this standard; however, we believe that it has been met. Mrs. Moore was under subpoena to appear at trial and, shortly before the trial date, told the prosecutor that she would testify. She fled the jurisdiction after jeopardy had attached, and the prosecution's motion for a continuance, opposed by Moore, was denied. Moore argues that the prosecution had known for months that Mrs. Moore was a "recalcitrant" witness and, thus, should have requested a material witness order.[20] As the circuit court properly noted in its ruling, however, where Mrs. Moore had indicated that she would be present to testify, the prosecution would have been acting in bad faith had it stated in an affidavit in support of a request for a material witness order that it had "reasonable cause to believe [that Mrs. Moore would] not be ... responsive to a subpoena at a time when [her] attendance [was] sought." HRS § 835–2(a)(2) (1993).

We hold that the prosecution established, on the record at trial, that Mrs. Moore was unavailable and that it had made a good faith effort to secure her presence.

■ The second factor in the *Roberts* analysis, after unavailability is shown, is the reliability of the statement. "Reliability is shown 'if the evidence falls within a firmly rooted hearsay exception' or 'upon a showing of particularized guarantees of trustworthiness.'" *Ortiz,* 74 Haw. at 361, 845 P.2d at 556 (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539). "Generally, the introduction of prior testimony does not violate the confrontation clause if there is sufficient proof of the unavailability." *State v. Lincoln,* 71 Haw. 274, 279, 789 P.2d 497, 500 (1990) (citing *Kim*). We thus examine whether Mrs. Moore's testimony at the supervised release hearing was admissible as former testimony under HRE Rule 804(b)(1), which excludes such testimony from the hearsay rule when

---

**20.** "A material witness order is a court order (1) adjudging a person a material witness in a pending criminal action and (2) fixing bail to secure the person's future attendance thereat." HRS § 835–1 (1993).

the declarant is unavailable. *See supra* note 7.

Moore argues that the former testimony was inadmissible because it was given at a bail hearing which involved fundamentally different motives and interests from those at trial and there was no cross-examination on the statement. The argument, however, is not persuasive.

The primary issue at the January 7, 1993 supervised release hearing was whether Moore presented a danger to Mrs. Moore, particularly because it was a one-witness case and there were no terms or conditions to protect that witness. Mrs. Moore testified in support of Moore's motion that she did not believe that Moore presented a danger to her. On cross-examination, the prosecution asked, "Mrs. Moore, on January 7, 1992, it was your husband who shot you five times; is that correct?" Mrs. Moore responded "[f]our or five, I'm not certain." Defense counsel did not attempt to rebut the statement through redirect examination.

As the circuit court ruled, Moore's identity as the shooter was obviously an issue in both the supervised release hearing and at trial. Moore had every motive to rebut Mrs. Moore's testimony. If he could establish through Mrs. Moore, the victim and only witness other than Moore himself, that it was in fact someone else who had shot her, his chances for release would have been greatly enhanced. HRE Rule 804(b)(1) does not require that the former testimony have been developed by direct, cross, or redirect examination, but only that the party against whom the testimony is later offered had the opportunity and motive to do so. The circuit court rightly concluded that the requirements of Rule 804(b)(1) were satisfied.

Accordingly, we hold that the admission of Mrs. Moore's testimony from the supervised release hearing did not violate Moore's right to confront his accuser under the United States or Hawai'i Constitutions.

Finally, Moore argues that the court's refusal to admit a "related" statement from the supervised release hearing violated HRE Rule 106 (1993), which provides that, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him [or her] at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously."

The court made clear that the only testimony from the supervised release hearing that it found admissible "is the fact that it was Mr. Moore who shot Mrs. Moore." Moore sought to introduce Mrs. Moore's direct testimony from the same hearing that, "[o]ver a period of time, a long period of time, I did finally come to the conclusion that Bob Moore, the person I knew, was not the person that shot me that night." Defense counsel argued that the statement should be admitted because it "goes to identity."

The court denied the request, stating:

It's my position that I read this to be very clear that what Mrs. Moore is talking about is an emotional or psychological example. I think it's clear, when I look at the whole context of it, and that's why I'm denying it. Because if I allow that portion in, I'll have to allow the whole transcript in so the jury can get the full flavor of what's being testified to. And the record will bear me out.

The record, indeed, "bears out" the trial court's ruling. The statement was properly excluded. The statement was offered in isolation; yet, read in context, Mrs. Moore never disputed that Moore shot her; she asserted only that his conduct at that time was so different from his ordinary behavior that it was as though he was a different person. Fairness did not require that the statement be considered contemporaneously with the statement introduced by the prosecution.

## III. *CONCLUSION*

For the foregoing reasons, we affirm Moore's convictions of attempted second degree murder and use of a firearm in the commission of a felony.