193 P.3d 1274

**STATE of Hawai‘i, Plaintiff–Appellee,**

v.

**Michael Arlo PAVICH, aka "Arlo,",
Defendant–Appellant.**

No. 27987.

Intermediate Court of Appeals of Hawai‘i.

Sept. 16, 2008.

As Corrected Oct. 10, 2008.

Keith S. Shigetomi, Honolulu, ·on the briefs, for Defendant–Appellant.

Richard K. Minatoya, Deputy Prosecuting Attorney, County of Maui, on the briefs, for Plaintiff–Appellee.

RECKTENWALD, C.J., FOLEY, and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

Dr. Edward Bird (Dr. Bird) was murdered in his apartment. He was repeatedly hit on the face and head with a blunt object and manually strangled to death. At the time of his death, Dr. Bird was approximately eighty-two years old and largely confined to a wheelchair.

Defendant–Appellant Michael Arlo Pavich (Pavich) and his co-defendant Lisa Ann Healani Avilla (Avilla) were charged with the murder of Dr. Bird and related offenses. They were jointly charged in an indictment with first-degree burglary of Dr. Bird's residence (Count 1); kidnapping Dr. Bird (Count 2); first-degree robbery of Dr. Bird (Count 3); and second-degree murder of Dr. Bird (Count 4). Pavich was separately charged in the indictment with possession of methamphetamine (Count 7) and possession with intent to use drug paraphernalia (Count 8), and Avilla was also separately charged with these two offenses (Counts 5 and 6).

Avilla entered into a plea agreement with Plaintiff–Appellee State of Hawai'i (the State) and testified against Pavich. She testified to witnessing Pavich murder Dr. Bird and commit the related burglary, kidnapping, and robbery offenses. Avilla was the only eyewitness to Pavich's alleged commission of these offenses.

During its investigation, the State recovered evidence which it submitted for deoxyribonucleic acid (DNA) analysis to a private laboratory, Genetic Technologies, Inc. (Genetic Technologies). The Circuit Court of the Second Circuit (circuit court) granted Pavich's motion for funds to hire his own DNA expert, Forensic Science Associates (Forensic Science), to independently analyze the DNA tests conducted by Genetic Technologies. The evidence submitted for DNA analysis included napkins recovered from Dr. Bird's apartment that contained apparent blood stains. DNA analysis was performed by the experts hired by both the State and Pavich. Prior to trial, Pavich advised the circuit court that he did not plan to call anyone from Forensic Science as an expert witness and would not disclose the results of Forensic Science's analysis to the State.

Approximately ten months before trial, the State disclosed to Pavich a forensic report of the DNA analysis performed by Genetic Technologies. As to the napkin stains, the report stated that Dr. Bird, Pavich, and Avilla could not be excluded as potential contributors to the mixture of DNA recovered from three of the stains. The report contained a table of the genetic profiles on which its analysis was based. During jury selection, which lasted fourteen days, the State disclosed to Pavich a supplemental forensic report prepared by Genetic Technologies. With respect to one of the napkin stains (stain Q3E), the supplemental report stated that Pavich could not be excluded as the major contributor to the mixture of DNA recovered from that stain. The supplemental report further stated that the genetic profile of the major contributor to stain Q3E is expected to occur in approximately 1 in 66 million in the Caucasian population, 1 in 1 billion in the African American population, and 1 in 160 million in the Hispanic population among unrelated individuals.

Pavich did not move in limine to preclude testimony based on the supplemental report. He also did not object when Stephanie Beine (Beine) of Genetic Technologies testified at trial about the findings set forth in the supplemental report. However, after Beine completed her testimony, Pavich moved for a mistrial or, in the alternative, to strike Beine's testimony about the findings contained in the supplemental report. The cir-

cuit court[1] granted Pavich's motion for a mid-trial continuance so that Pavich's DNA expert, Forensic Science, could perform a peer review of the supplemental report. The circuit court, however, ended the continuance after Forensic Science refused to perform the peer review, then said it would take two months to complete, and because the circuit court was not convinced that Pavich could secure a new expert to expeditiously conduct the peer review. The court struck the portion of Beine's testimony relating to the probability analysis involving stain Q3E that was contained in the supplemental report. The court did not strike Beine's testimony concerning the supplemental report's finding that Pavich could not be excluded as the major contributor to the mixture of DNA recovered from stain Q3E.

The jury found Pavich guilty as charged of second-degree murder, first-degree burglary, kidnapping, first-degree robbery, and possessing with intent to use drug paraphernalia.[2] Pavich moved for a new trial. In connection with that motion, he sought approval from the circuit court for litigation costs to hire a DNA expert to conduct a peer review of the findings contained in Genetic Technologies' supplemental report. He also alleged that a new trial was warranted because the State failed to fully disclose the terms of its plea agreement with Avilla and that the circuit court erred in refusing to instruct the jury on the included offense of manslaughter. The court denied Pavich's request for funds to hire a DNA expert to conduct a peer review and denied Pavich's motion for a new trial. The circuit court sentenced Pavich to terms of incarceration that amounted to life imprisonment with the possibility of parole plus an additional thirty years.[3]

On appeal, Pavich argues that: 1) his rights to a fair trial and to present a defense were violated by a) the circuit court's mishandling of his request for peer review of Genetic Technologies' supplemental report and b) the State's failure to disclose certain representations it made to Avilla; 2) the circuit court erred by denying his motion to sever the drug paraphernalia count from the remaining counts; and 3) the circuit court erred by refusing to give the jury an instruction on the defense of extreme mental or emotional disturbance (EMED).

We hold that, under the unique circumstances of this case, the circuit court erred in refusing to grant Pavich's post-trial motion for approval of litigation costs to hire a DNA expert to conduct a peer review of Genetic Technologies' supplemental report. We remand the case with directions that the circuit court: 1) authorize reasonable litigation costs to permit Pavich to hire a DNA expert to conduct the requested peer review and 2) allow Pavich to refile a motion for new trial based on the results of the peer review. We conclude that the other arguments raised by Pavich on appeal are without merit.[4]

## BACKGROUND

### I.

Dr. Bird lived alone in a unit on the ground floor of the Pacific Shores apartment complex in Kihei, Maui. On the morning of December 3, 2000, Dr. Bird was found dead in the bedroom of his apartment. Dr. Bird was discovered face down, his legs wrapped in sheets, with visible injuries to the back of his head. Blood was smeared on the walls

---

1. The Honorable Joseph E. Cardozo presided over Pavich's trial and the subsequent proceedings.

2. Prior to trial, the circuit court had granted the State's motion to dismiss the drug possession charge (Count 7).

3. The circuit court sentenced Pavich to terms of imprisonment of ten years for the first-degree burglary conviction (Count 1), twenty years for the kidnapping conviction (Count 2); twenty years for the first-degree robbery conviction (Count 3); life with the possibility of parole for the second-degree murder conviction (Count 4);

and five years for the drug paraphernalia conviction (Count 8). The court imposed the sentences on Counts 2 and 3 concurrent to each other but consecutive to Count 1; the sentence on Count 4 consecutive to the sentences on Counts 1, 2, and 3, and the sentence on Count 8 concurrent to Count 1.

4. Our decision to remand the case does not affect the validity of Pavich's conviction and sentencing on Count 8, the drug paraphernalia count. We therefore affirm his conviction and sentence on Count 8.

and had soaked into a pillow on the floor that was near his head. The bedroom was in disarray with papers strewn on the floor, and the line to the telephone in the living room had been cut.

Forensic pathologist Dr. Anthony Manoukian performed an autopsy on Dr. Bird. Dr. Manoukian determined that the cause of death was manual strangulation. In addition, Dr. Manoukian opined that Dr. Bird had suffered multiple traumatic injuries to the head and face, consistent with being beaten with an object or a fist.

Around the time of Dr. Bird's death, Pavich was staying at Avilla's one-bedroom apartment, along with Shannon Estencion (Estencion), Denise Granados (Granados), and Tania Abraham (Abraham). Pavich knew Avilla because they had attended elementary school together on Maui and because Pavich was a close friend of Avilla's cousin, Mitchell Williams. Estencion was Avilla's cousin, Granados was Estencion's girlfriend, and Abraham was Avilla's good friend as well as the girlfriend of Avilla's uncle. Avilla's apartment was described as a "drug house" and everyone staying at Avilla's apartment, including Pavich, was using drugs—primarily crystal methamphetamine.

Avilla was familiar with Dr. Bird because she had previously lived at the Pacific Shores complex. Dr. Bird had filed a complaint against Avilla with the police, accusing her of stealing items from his apartment.

## II.

At Pavich's trial, Avilla testified that in the evening on December 2, 2000, she took Pavich to Dr. Bird's apartment knowing that he intended to "rob the place." According to Avilla, Pavich went into Dr. Bird's apartment while she waited outside. Avilla heard noises in the apartment, went inside, and saw Pavich and Dr. Bird struggling with each other in Dr. Bird's bedroom. Avilla saw Pavich punching Dr. Bird and hitting Dr. Bird with a lamp. Pavich threw a quilt over Dr. Bird and told Avilla to "go grab something." Avilla obtained a blender cup from the kitchen. At Pavich's instruction, Avilla hit Dr. Bird, who was covered and on the ground, with the blender cup.

Avilla testified that while Dr. Bird was on the ground, "it looked like [Pavich] was choking [Dr. Bird]." When Pavich and Avilla returned to Avilla's apartment, Pavich told her to calm down and warned her not to tell on him. At her apartment, Avilla saw the lamp, blender cup, and Dr. Bird's credit cards and papers that Pavich had taken from Dr. Bird's apartment.

Shannon Estencion testified that during the early part of December 2000, while he was at Avilla's apartment, Pavich asked Estencion to accompany Pavich to get some cash. Pavich told Estencion, "Fuck, I need some fucking cash. You like come with me? I need do some trips." Estencion declined Pavich's request. Pavich then left the apartment, followed after a short time by Avilla.

Estencion testified that Pavich and Avilla returned to the apartment several hours later. Avilla was hysterical and Pavich was in "kind of [a] panic." Pavich called Estencion into the bedroom and told Estencion, "I fucked up, I fucked up."

According to Estencion, Pavich told Estencion what had happened and related the following details to Estencion. Pavich explained that while he and Avilla were "robbing one house," "[t]his guy got up making big noise," and so Pavich covered the person's mouth and was bitten. Pavich then hit the person on the head with a lamp. Pavich asked Avilla to get a knife from the kitchen, but she came back with a blender cup, which she used to strike the person a "couple of times." Pavich told Avilla that he could not leave because the guy had seen them. Pavich had to make sure that the guy was not breathing. Pavich thought the guy was dead.

Estencion testified that he noticed bite marks on Pavich's fingers, which appeared to have punctured the skin. Estencion also saw paper with the name "Bird" on it in Avilla's bedroom. Pavich showed Estencion a blender cup and a desk lamp with blood on them and asked Estencion to help get rid of them. Estencion refused and left the apartment.

Tania Abraham testified that in the beginning of December 2000, she learned about an incident involving Pavich and Avilla. Avilla told Abraham, "We went kill somebody." After the incident, Avilla appeared scared and cried all the time. Abraham testified that Pavich threatened that "if anyone opened their mouth," he would kill them and their kids.

Denise Granados testified that during the evening on December 2, 2000, Pavich and Avilla left Avilla's apartment and returned about three hours later. After Pavich and Avilla returned, they went into the bedroom, shut the door, and barred Granados from coming inside. Later, Granados was allowed into the bedroom and saw credit cards and mail.

The defense impeached Avilla, Estencion, Abraham, and Granados on various grounds, including that Avilla was testifying pursuant to a plea agreement that called for the reduction of her second-degree murder charge to manslaughter; that Estencion was Avilla's cousin, Granados was Estencion's girlfriend, and Abraham was Avilla's friend; that Avilla, Granados, and Abraham spent time in jail together after Avilla and Pavich had been charged with murdering Dr. Bird; that Avilla, Estencion, Abraham, and Granados had not always been truthful in statements made to the police and had made prior inconsistent statements; and that they all had criminal records and had been heavy and habitual drug users around the time of Dr. Bird's murder.

### III.

On December 17, 2000, about two weeks after Dr. Bird had been murdered, Officer Anthony Krau and other Maui police officers responded to a call from dispatch reporting a possible sighting of Pavich. Officer Krau testified that he was in uniform and driving a marked patrol car. He saw Pavich carrying a black bag. Officer Krau identified himself as a police officer and directed Pavich to stop. Pavich took off running and eluded Officer Krau and the other officers involved in the pursuit. The police, however, recovered the black bag Pavich had been carrying after a bystander pointed it out. Later that

day, Pavich turned himself into the police. The bag abandoned by Pavich was searched and found to contain drug paraphernalia, including glass pipes and plastic packets. The bag also contained leather gloves, a stocking cap, a screwdriver, a knife, and a prescription pill bottle with Avilla's name on it.

### IV.

Pavich testified in his own defense at trial. Pavich stated that he grew up on Maui and, after living on the mainland for about six years, returned to Maui in the beginning of 2000. Back on Maui, Pavich was using drugs, including crystal methamphetamine, marijuana, and alcohol. He was "hanging out" with Estencion and Granados and accompanied them when they went to stay at Avilla's house.

Pavich testified that on December 2, 2000, he found Avilla outside the apartment, very drunk, stealing mail from mailboxes on her street. As Pavich was trying to convince Avilla to stop, Estencion pulled up in Avilla's car. Pavich and Avilla got into the car, and Estencion drove to a nearby beach where they all used drugs.

According to Pavich, Avilla asked Pavich and Estencion if they wanted to "rip off that asshole who called the cops on me." Pavich did not know to whom Avilla was referring and said he did not want to go. Avilla and Estencion drove away, leaving Pavich at the beach. Avilla and Estencion later returned, picked up Pavich, and drove to Avilla's apartment. The three of them went into the bedroom and Avilla took out a stack of credit cards and some papers. Pavich also noticed a blender and a lamp with blood on it. Avilla told Pavich what had happened and Pavich was shocked. Pavich wanted to leave the apartment but stayed the night because Avilla begged him to stay.

Pavich testified that he had never been in Dr. Bird's apartment and denied that he had killed or caused the death of Dr. Bird. Pavich stated that he ran from the police on December 17, 2000, because he had drug paraphernalia and had been using drugs. He admitted that he had been carrying the black bag

seized by the police and that the bag's contents belonged to him.

## V.

### A.

The State submitted evidence recovered in the investigation, along with known DNA samples from Pavich, Avilla, and Dr. Bird, to Genetic Technologies for DNA analysis. The most noteworthy of the evidence submitted turned out to be bunched-up napkins with apparent blood stains that were found in Dr. Bird's kitchen. The circuit court granted Pavich's motion for approval of litigation costs to hire a DNA expert, Forensic Science, to assist the defense. The parties agreed that after Genetic Technologies completed its analysis, the evidence would be transmitted to Forensic Science so that Forensic Science could conduct an independent DNA analysis. The trial was continued numerous times by stipulation while the parties awaited the results of the DNA analysis.

Both Genetic Technologies and Forensic Science completed their DNA analyses. Genetic Technologies prepared a forensic report dated October 28, 2004, which was disclosed to the defense. The report stated that five stains found on the napkins, which were identified as Q3A through Q3E, were analyzed. With respect to stains Q3C and Q3D, the report found that the genetic profile obtained from the stains consists of a mixture of DNA from at least two individuals; that Dr. Bird and Pavich cannot be excluded as potential contributors to the DNA recovered from the stains; and that Avilla shares common alleles [5] with the profile of the stains, but it is unlikely that she is a contributor to the stains. With respect to stain Q3E, the report found that the genetic profile obtained from the stain consists of a mixture of DNA from at least two individuals; that Dr. Bird, Pavich, and Avilla cannot be excluded as potential contributors to the DNA recovered from this stain; and that DNA foreign to Dr. Bird, Pavich, and Avilla was identified on the stain. The report included a table that showed a comparison of the genetic profiles of the DNA obtained from the napkin stains and the DNA of Dr. Bird, Pavich, and Avilla on which the report's findings were based.

Forensic Science completed the DNA analysis requested by Pavich. Pavich did not disclose the results of Forensic Science's analysis to the State, nor did he identify an expert from Forensic Science as one of the witnesses he planned to call at trial.

Jury selection began on September 6, 2005, and was completed on September 19, 2005. On September 9, 2005, Genetic Technologies completed a supplemental forensic report (supplemental report). On about September 9, 2005, the supplemental report was disclosed to Pavich.[6] The supplemental report contained references to "major contributor" that had not appeared in the original forensic report. The supplemental report also included a probability analysis regarding stain Q3E, which stated:

> Michael Pavich ... cannot be excluded as the major contributor to the mixture of DNA recovered from item Q3E-pink napkins at the following loci: D3S1358, vWA, FGA, D21S11, D18S51 and D13S317. The genetic profile of the major contributor to this item (at the six previously listed loci) is expected to occur in approximately 1 in 66 million in the Caucasian population, in approximately 1 in 1 billion in the African American population and in approximately

---

**5.** An "allele" is "any of the alternative forms of a gene that may occur at a given locus." *Merriam–Webster's Collegiate Dictionary* 32 (11th ed.2003). A "locus" is "the position in a chromosome of a particular gene or allele." *Id.* at 731.

**6.** The precise date on which Pavich received the supplemental report is not clear from the record. The supplemental report was signed before a notary public in Missouri on September 9, 2005. On September 22, 2005, the first occasion in the record that the disclosure of the report was discussed by the parties, the State represented that it faxed the report to the defense as soon as the State received the report (although the means by which the report was delivered to the State is not stated). Pavich's counsel represented that he did not recall exactly when he received the report and that it was sometime after September 9, 2005, but before the evidentiary portion of the trial began on September 21, 2005. In subsequent rulings, the circuit court referred to the supplemental report as being disclosed to the defense on September 9, 2005, without objection by Pavich.

1 in 160 million in the Hispanic population among unrelated individuals.

The supplemental report reproduced a table showing the genetic profile of the DNA recovered from stain Q3E that had been included in the original forensic report. Pavich did not object to the supplemental report, move in limine to preclude testimony based on the supplemental report, or seek a continuance upon receiving the report.

On September 21, 2005, the State called Stephanie Beine of Genetic Technologies, who was qualified to testify as an expert on DNA analysis and testing. Beine testified that a single-source sample means that there is evidence of DNA from only one person in the sample, while a mixture means that there is evidence of DNA from more than one person in the sample. A mixture sample has a major contributor when the DNA from one person is found in much higher concentration than the DNA from another person or persons. Stains Q3C, Q3D, and Q3E obtained from the napkins were mixture samples.

Beine testified that as to stains Q3C and Q3D, the major contributor was consistent with[7] Dr. Bird, and Pavich could not be excluded as the minor contributor.[8] As to stain Q3E, Beine testified that Pavich could not be excluded as the major contributor, meaning that the majority of the DNA found in stain Q3E was consistent with Pavich.[9] The State introduced an exhibit that included a comparison of the genetic profile of stain Q3E with the genetic profiles of Pavich, Dr. Bird, and Avilla. Beine testified that Pavich's genetic information was represented or "accounted for" in the DNA recovered from stain Q3E at each of the nine loci analyzed. Beine testified that to a reasonable degree of scientific certainty, the major contributor to stain Q3E was consistent with Pavich. Beine acknowledged that there was also DNA found in stain Q3E that could not be attributed to Pavich, Dr. Bird, or Avilla.

On redirect examination, Beine explained that her opinion that the major contributor to stain Q3E was consistent with Pavich was based on the analysis which showed that each of Pavich's genetic profile numbers were represented in the genetic profile of stain Q3E. Beine was asked what the probability was that "[Pavich] is the major contributor in [stain] Q3E," and she testified:

> The profile that we obtained from [stain] Q3E is consistent with Mr. Pavich. That profile is expected to occur in approximately one in 66 million individuals in the caucasian population, and one in one billion individuals in the African American population, and one in 160 million individuals in the Hispanic population.

Beine stated that by looking at Pavich, he did not appear to be African American. Pavich did not object to Beine's testimony that the major contributor to stain Q3E was consistent with Pavich (hereinafter the "major-contributor testimony") or her testimony on the probability analysis relating to stain Q3E (hereinafter the "probability testimony").

### B.

Beine completed her testimony in the morning on September 22, 2005. In the afternoon, Pavich moved for a mistrial based on Beine's probability testimony or, in the alternative, to strike that testimony. Pavich argued that this testimony was based on information in the supplemental report that was disclosed during jury selection, and thus the defense lacked adequate time to prepare. The State responded that the probability analysis set forth in the supplemental report was based on data disclosed in the original forensic report dated October 28, 2004, which the defense had received long before trial. The State represented that it faxed the supplemental report to the defense upon receipt and that the defense had the supplemental report "well before" the evidentiary portion

---

7. Beine stated that "[w]hen we say consistent with, we're basically saying there is nothing in the sample that isn't consistent with."

8. Beine testified that Avilla also could not be excluded as a minor contributor to stains Q3C and Q3D, but that it was more likely that Pavich rather than Avilla was the minor contributor.

9. Beine appeared to use the terms "could not be excluded as" and "consistent with" interchangeably, as she testified that Pavich could not be excluded as the major contributor to stain Q3E and that the major contributor to stain Q3E was consistent with Pavich.

of the trial began. The State noted that Pavich had not moved in limine to exclude the information in the supplemental report and had not objected to Beine's testimony.

After hearing the parties' arguments, the circuit court denied Pavich's motion for a mistrial and his alternative motion to strike testimony. The court noted that Pavich had not filed any motion with respect to the information in the supplemental report, which appeared to be a follow-up of the original forensic report provided to the defense in 2004.

Six days later, Pavich notified the circuit court that he planned to request the data on which the supplemental report was based so that the defense laboratory, Forensic Science, could conduct a review of the supplemental report. Pavich also notified the court that he planned to request a trial continuance to permit Forensic Science to conduct the review. The following day, September 29, 2005, Pavich filed a motion to compel discovery, requesting the disclosure of copies of "the population gene frequency data" and "evidentiary electronic data and the genetic frequency data" that Genetic Technologies relied upon "in preparing [the supplemental report] and its testimony in the ... case."

On October 3, 2005, the circuit court held a hearing on Pavich's motion to compel discovery. Pavich claimed that the supplemental report contained new findings concerning the probability analysis and the identification of Pavich as the major contributor to stain Q3E. He argued that the defense needed the requested information so that Forensic Science could conduct a peer review of the supplemental report to make sure that it was accurate. The State repeated its claim that the supplemental report did not change the original forensic report but was based on data disclosed in the original report. The State noted that it would prefer that the court strike Beine's probability testimony rather than grant a long continuance. The circuit court granted Pavich's motion to compel and stated that it expected Genetic Technologies to promptly disclose the requested information and Forensic Science to conduct its peer review of the supplemental report expeditiously.

## C.

The State completed its case-in-chief on October 5, 2005, and rested. The defense called one witness, then moved to continue the trial to permit Forensic Science to conduct the peer review of the analysis contained in the supplemental report. The court granted a one-week continuance until October 12, 2005.

At a status hearing held on October 6, 2005, the State represented that Genetic Technologies had sent the requested information on a disk to Forensic Science. Pavich responded that Forensic Science had received a packet from Genetic Technologies but had reported that the information received was "totally inadequate." Pavich stated that according to Forensic Science, it did not receive all the information needed to conduct its peer review and that a critical file on the disk it received was corrupted. To clarify the dispute, the circuit court ordered that Forensic Science immediately prepare a written statement identifying the specific information it wanted from Genetic Technologies and the electronic format Forensic Science needed to access the information.

At a status hearing held on October 7, 2005, Pavich informed the circuit court that Forensic Science refused to prepare the written statement ordered by the court and refused to do any further work on the case. Pavich stated that he still wanted to conduct a peer review of the supplemental report.

At a status hearing held on Monday, October 10, 2005, Pavich informed the court that Forensic Science had reconsidered and was willing to conduct the peer review, but that the review would take two months to complete. Forensic Science, however, still had not prepared the written statement of the specific information it wanted from Genetic Technologies as ordered by the court. Pavich contacted a different expert, Dr. Norah Rudin, who indicated that if she promptly received the necessary materials, she could complete her analysis by the end of the following week.

On October 11, 2005, the circuit court ruled that it would strike Beine's probability testi-

mony rather than further continue the trial for the defense to conduct a peer review of the supplemental report. In support of its ruling, the court noted that it was unclear when an expert for the defense would be able to complete the peer review; that Beine's probability testimony came in without objection; that the defense had already made a decision not to call a defense DNA expert at the time the trial began; that the defense had made an alternative motion to strike the probability testimony and the prosecution had also favored striking the testimony over a long continuance; and that striking the testimony provided a means to conclude the trial in a reasonable fashion without it being an open-ended affair that would risk the loss of jurors.

The trial reconvened on October 12, 2005. Pavich argued that in addition to the probability analysis, the supplemental report also contained new findings on which Beine's major-contributor testimony was based. Pavich renewed his motions for a mistrial and a continuance to conduct a peer review, which the circuit court denied. The circuit court considered whether, in addition to striking Beine's probability testimony, it should also strike Beine's major-contributor testimony. The court ruled that it would not strike Beine's major-contributor testimony. Among other things, the court noted that Pavich had not objected to the major-contributor testimony and that the source information relating to this testimony was disclosed in the original forensic report.

With respect to Beine's probability testimony, the circuit court instructed the jury as follows:

[T]he Court has ordered stricken any evidence presented by Stephanie Beine concerning the rate or probability at which the profile from Q3E is expected to occur in the Caucasian population, African American population and Hispanic population. This means that you must disregard entirely this evidence and may not consider this evidence in any way during your deliberations in this case. Also you may not during your deliberations consider or speculate about the reasons for the Court's order striking this evidence.

## D.

After the jury returned guilty verdicts against Pavich, he moved for approval of litigation costs to permit him to retain a DNA expert to conduct a peer review of Genetic Technologies' supplemental report. Pavich argued that he needed to conduct the peer review in order to support his motion for a new trial. The circuit court denied the motion for litigation costs, citing a number of factors, including the following: The court noted that it had previously authorized funds to permit the defense to hire a DNA expert to conduct an analysis of the evidence, which had been completed before trial, and that the defense decided not to call its expert. Pavich had not objected to Beine's major-contributor testimony or her probability testimony, and the court had struck the probability testimony. In addition, the court stated that it did not believe that whether Pavich was classified as the major contributor or minor contributor to stain Q3E was significant in terms of whether Pavich's body fluid was on the napkin because in either event, the evidence was probative of placing him in Dr. Bird's apartment. The court stated:

[I]f we assume for a moment that the lab conducts peer review and says that the prosecution's expert was wrong and that Mr. Pavich was the minor contributor versus major contributor, we're still left with the same result, and that is that the body fluid is on the napkin in question.

The circuit court subsequently ordered that all evidence related to Genetic Technologies' DNA analysis be preserved, including the evidence tested, the results of the tests, and the source information related to the conclusions or opinions reached.

## DISCUSSION

### I.

Pavich argues that the circuit court's handling of his requests to conduct a peer review of the supplemental report during trial and post-trial violated his due process rights to a fair trial and the fair opportunity to present a defense. We are unable to find fault with

the circuit court's handling of Pavich's request for peer review during trial. However, under the unique circumstances of this case, we conclude that the circuit court erred in denying Pavich's post-trial motion for approval of litigation costs to hire a DNA expert to conduct a peer review of the supplemental report.

## A.

■ We conclude that the circuit court did not abuse its discretion in handling Pavich's request for peer review during trial. Pavich had received the supplemental report after jury selection began but apparently well before the fourteen-day jury selection was completed.[10] Pavich did not move in limine to preclude the State from introducing testimony based on the supplemental report and did not object to Beine's major-contributor and probability testimony. Thus, this testimony was properly admitted.

Pavich later moved for a mistrial or, in the alternative, to strike Beine's probability testimony. In response, the circuit court ordered the State to disclose the information underlying the supplemental report to Forensic Science, Pavich's previously-retained DNA expert, and continued the trial for one week to permit Forensic Science to do a peer review of the supplemental report. Forensic Science, however, refused to comply with the court's order to put the specific information it needed from Genetic Technologies in writing, refused to participate in the peer review, and then stated that it was willing to do the peer review but that the review would take two months to complete. One day before the trial was set to resume, Pavich contacted another DNA expert who indicated that she could perform a peer review in about two weeks, but who had no previous involvement in the case.

Under these circumstances, the circuit court's decision to deny any further continuance of the trial for a peer review and instead to strike the probability testimony was not an abuse of discretion. When the court ruled, there was no assurance that a peer review could in fact be completed within a reasonable period of time. The court noted that the probability testimony had been admitted without objection. Nevertheless, to minimize the possible prejudice to the defense from the lack of a peer review, the court elected to strike the probability testimony.

After the circuit court announced its decision to strike the probability testimony, Pavich argued that Beine's major-contributor testimony also necessitated a continuance to enable the defense to obtain a peer review of the supplemental report. We conclude that the circuit court did not abuse its discretion in refusing to grant a further continuance for a peer review with respect to Beine's major-contributor testimony. *See State v. Lee*, 9 Haw.App. 600, 603, 856 P.2d 1279, 1281 (1993) (stating that "[a] motion for continuance is addressed to the sound discretion of the trial court"). There were valid reasons for the court to refuse to grant a further continuance, including the lack of reliable assurance that a peer review could be completed within a reasonable period of time and the detrimental effect that an extended trial continuance could have on the jury.

■ We also conclude that the circuit court did not err in declining to strike the major-contributor testimony. Pavich failed to raise any concerns about the major-contributor testimony *before* it was admitted. He did not move in limine to exclude the major-contributor testimony, request the opportunity for peer review *before* Beine testified, or object during Beine's testimony to the questions that elicited the major-contributor testimony or the answers Beine gave. Thus, any disadvantage created by the admission of the major-contributor testimony was the product of Pavich's own inaction. Beine's major-contributor testimony was clearly relevant, and Pavich did not cite any evidentiary basis for excluding the testimony.

In addition, the major-contributor testimony appears to have been derived from source information included in the original forensic

---

10. At oral argument, Pavich's counsel indicated that he recalled receiving the supplemental report around September 11, 2005. The evidentiary portion of the trial began on September 21, 2005.

report, which had been disclosed to the defense long before trial. In explaining the basis for her major-contributor testimony, Beine cited evidence that Pavich's genetic profile numbers were represented or accounted for in the genetic profile numbers recovered from stain Q3E at each locus analyzed. The genetic profile numbers for Pavich and stain Q3E, as well as for Dr. Bird and Avilla, were included in the original forensic report.[11] Pavich had the opportunity to explore the potential implications of the genetic profile numbers before trial.

### B.

■ Nevertheless, we conclude that the circuit court erred in refusing to approve Pavich's post-trial request for approval of funds to conduct the peer review. Aside from the DNA evidence, the State's main evidence consisted of the testimony of Avilla, a charged accomplice in Dr. Bird's murder who testified pursuant to a plea agreement, and the testimony of others who were associated with Avilla, had criminal records, and had been heavy drugs users. Beine's major-contributor testimony could have materially influenced the jury. The same is true of Beine's probability testimony, even though that testimony was stricken by the circuit court.

In support of its decision to deny Pavich's post-trial motion for litigation costs, the circuit court expressed its belief that the major contributor versus minor contributor designation was not significant because either designation would place Pavich's body fluid on the napkin. We question this analysis. Beine testified that Pavich could not be excluded as or was consistent with a major or minor contributor to certain napkin stains; her testimony did not establish that Pavich's DNA was, in fact, found in the napkin stains. Based on Beine's testimony, neither a finding

that the major contributor to a sample was consistent with Pavich nor a finding that a minor contributor to a sample was consistent with Pavich necessarily means that Pavich's body fluid was found in the sample. Moreover, the supplemental report indicates that the probability analysis may differ greatly depending on whether a person's genetic profile is found to be consistent with the major contributor versus a minor contributor to a sample.

Furthermore, although Forensic Science refused to cooperate in conducting a peer review during the trial, it sent a letter dated October 7, 2005, to defense counsel that was critical of the analysis in Genetic Technologies' supplemental report. In the letter, Forensic Science stated:

> The appearance of what [Genetic Technologies] have done is to assume that Mr. Pavich's genotypes are in the evidence rather than to consider all possible genotypes that can be deduced from the evidence. Rationalizing from the suspect to the evidence; rather than from the evidence to the rest of the world is a misrepresentation of the scientific method because it invokes circular reasoning at its worst.

(Emphasis in original omitted.)

Under the unusual circumstances of this case, where a combination of factors resulted in the major-contributor and probability testimony being presented to the jury without the defense having conducted a peer review of the supplemental report, the circuit court should have approved Pavich's post-trial request for litigation costs. The post-trial peer review is necessary to enable Pavich to determine whether Beine's major-contributor and probability testimony was accurate and thus to determine whether the jury's exposure to this testimony deprived him of a fair trial.

11. We note that Beine was asked by the State during its redirect examination whether the genetic profile numbers contained in the original forensic report were the numbers she relied upon "in order to determine major contributor and minor contributor." She replied, "Not solely this information, but yes." This answer is ambiguous in that it does not tell us what other information Beine relied upon or whether that information was contained in, or could be derived from, the original forensic report. Pavich did not question Beine about this answer on recross-examination. In the circuit court and on appeal, the State has consistently represented that the information supporting Beine's major-contributor testimony was included in the original forensic report.

Although the situations are not exactly the same, we believe that useful guidance is provided by cases considering whether a defendant is entitled to a post-trial DNA analysis of previously untested evidence to attack his or her conviction. Courts have held that a defendant is entitled to post-trial DNA testing of evidence in cases in which "the [prosecution's] proofs are weak, when the record supports at least a reasonable doubt of guilt, and when there exists a way to establish guilt or innocence once and for all." *State v. Thomas*, 245 N.J.Super. 428, 586 A.2d 250, 254 (App.Div.1991); *see Commonwealth v. Brison*, 421 Pa.Super. 442, 618 A.2d 420, 425 (1992). In these cases, the appellate courts have remanded the case for DNA testing, with the trial court directed to determine whether the defendant is entitled to a new trial in light of the test results. *Thomas*, 586 A.2d at 254; *Brison*, 618 A.2d at 425 n. 13. If the trial court determines that a new trial is not warranted based on the test results, then the conviction stands. *Thomas*, 586 A.2d at 254; *Brison*, 618 A.2d at 425 n. 13.

In Pavich's case, the State's evidence was not especially strong and Beine's major-contributor testimony as well as the stricken probability testimony may have influenced the jury. As a result of his convictions, Pavich has been sentenced to life imprisonment with the possibility of parole plus consecutive terms of imprisonment totaling thirty years. Because Pavich did not obtain a peer review of the supplemental report, he lacked information that may have enabled him to rebut Beine's major-contributor and probability testimony. We conclude that Pavich is entitled to funds for a peer review to evaluate the supplemental report and to move for a new trial after the peer review is conducted.[12]

### C.

We reject Pavich's claim that the absence of the peer review during trial and the circuit court's post-trial refusal to approve litigation costs automatically entitles him to a new trial. In the absence of an objection from Pavich, Beine's major-contributor and probability testimony was properly admitted. If the peer review obtained on remand demonstrates that Beine's testimony was essentially accurate or that the availability of the peer review during trial would not have affected the outcome of the case, then Pavich was not deprived of a fair trial and a new trial is not warranted.

On remand, we direct the circuit court: 1) to authorize reasonable litigation costs to permit Pavich to conduct a peer review of the supplemental report; 2) to require the State to disclose to Pavich the information relied upon by Genetic Technologies in reaching the findings set forth in the supplemental report; and 3) to permit Pavich to file a new trial motion based on information obtained from the peer review. The circuit court shall determine whether to grant or deny any new trial motion filed by Pavich. If the circuit court denies the new trial motion, Pavich's convictions shall stand, subject to Pavich's right to appeal the denial of his new trial motion.[13]

### II.

Pavich argues that he was denied a fair trial because the State failed to disclose representations it made to Avilla as part of her plea agreement. Pavich contends that these undisclosed representations included that the State would: 1) consider recommending to the circuit court that Avilla serve concurrent terms of imprisonment; 2) consider recom-

---

**12.** We note that HRS §§ 844D–121 to –133 (Supp.2007) establish procedures for post-conviction DNA testing. These provisions permit a defendant "who was convicted of and sentenced for a crime" to move for DNA analysis of evidence and require the court to order DNA testing if certain conditions are met. HRS §§ 844D–121 and –123. The provisions do not by their terms apply to Pavich's post-trial motion for litigation costs to conduct a peer review because the motion was made by Pavich and decided by the circuit court before Pavich was sentenced. Nei-

ther party raised or argued HRS §§ 844D–121 to –133 in connection with Pavich's motion for litigation costs in the circuit court. Nor have the parties cited these provisions on appeal. We therefore do not address these provisions in deciding this appeal.

**13.** Obviously, Pavich's convictions shall stand if he does not file a new trial motion after completion of the peer review.

mending to the Hawai'i Paroling Authority that Avilla be paroled without serving additional jail time; and 3) see what it could do, if Avilla cooperated and testified truthfully. Pavich's argument is without merit.

The circuit court considered Pavich's non-disclosure claim at a hearing on Pavich's motion for a new trial, at which Avilla's attorney was called to testify. The record shows that: 1) before Avilla testified at Pavich's trial, the prosecutor informed Avilla's attorney that the State had not yet decided what sentence to recommend; 2) the State had not made any promises about what sentence it would recommend and only represented that things would go better for Avilla if she cooperated and testified truthfully; 3) that the only promises made by the State were included in its written plea offer to Avilla that had been disclosed to Pavich; 4) the State did not represent that it would refrain from moving for extended terms of imprisonment or consecutive sentences with respect to Avilla; and 5) Avilla's attorney was disappointed when the State moved for extended terms of imprisonment and for consecutive sentences.

After hearing the evidence, the circuit court rejected Pavich's non-disclosure claim. The court found that "[t]he prosecution fully and accurately disclosed to [Pavich] the plea agreement between Lisa Avilla and the State." It also concluded that "the State did not withhold potentially exculpatory evidence from [Pavich] and complied with their discovery obligations relative to their duty to disclose the plea agreement." The record fully supports the circuit court's decision.[14]

### III.

Pavich contends that the circuit court erred in denying his pre-trial motion to sever the drug paraphernalia count from the other counts.[15] He argues that evidence that he possessed drug paraphernalia prejudiced his right to a fair trial on the murder and other charges involving Dr. Bird.[16]

■ Pavich failed to renew his motion for severance at the close of the prosecution's case or at the close of all the evidence. Thus, his claim that the circuit court erred in denying his motion for severance is deemed waived. *State v. Balanza*, 93 Hawai'i 279, 288, 1 P.3d 281, 290 (2000).

■ Even if not waived, Pavich is not entitled to any relief on his severance claim. Under Hawai'i Rules of Penal Procedure (HRPP) Rule 8(a) (2008), "[t]wo or more offenses may be joined in one charge, with each offense stated in a separate count, when the offenses: ... (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." The court may sever charges "[i]f it appears that a defendant ... is prejudiced by a joinder of offenses ... for trial together...." HRPP Rule 14 (2008). In deciding whether severance is appropriate, the court must "weigh the possible prejudice to the defendant against the public interest in judicial economy." *Balanza*, 93 Hawai'i at 289, 1 P.3d at 291.

■ The drug paraphernalia charge and the other charges were properly joined because they were "based on ... a series of acts connected together." HRPP Rule 8(a). The evidence showed that Pavich's motive for the charged burglary and robbery was to obtain money to purchase drugs. Pavich's subsequent possession of drug paraphernalia was an act connected to the charged burglary and robbery because it served to demonstrate his motive for those offenses.

More importantly, Pavich's right to a fair trial on the murder and other charges involving Dr. Bird was not prejudiced by the join-

14. In addition, Pavich extensively cross-examined Avilla with respect to the plea agreement and her cooperation with the State. Avilla acknowledged that pursuant to the agreement, the State was reducing her second-degree murder charge to manslaughter. She further testified that she hoped to benefit from her plea agreement. Pavich was able to thoroughly impeach Avilla with respect to her plea agreement.

15. The Honorable Shackley F. Raffetto presided over Pavich's pre-trial motion to sever.

16. Pavich's pre-trial motion also sought to sever the methamphetamine possession count (Count 7) from the counts involving Dr. Bird. However, as discussed *supra* in note 2, the methamphetamine possession count was dismissed before trial.

der of the drug paraphernalia charge. Even if the drug paraphernalia charge had been severed, evidence of Pavich's possession of the drug paraphernalia would have been admissible in a trial of the other charges under Hawaii Rules of Evidence (HRE) Rule 404(b) (Supp.2007). As noted, Pavich's possession of drug paraphernalia was relevant to show his motive for the charged burglary and robbery, which allegedly led to his kidnapping and murder of Dr. Bird. *See United States v. Miranda,* 986 F.2d 1283, 1285 (9th Cir.1993) (holding that evidence of the defendant's drug habit was admissible to demonstrate motive to commit robbery under Federal Rules of Evidence Rule 404(b)); *see also State v. Cordeiro,* 99 Hawai'i 390, 413–17, 56 P.3d 692, 715–19 (2002) (holding that evidence of the defendant's use and sale of drugs was admissible under HRE Rule 404(b)). The drug paraphernalia evidence was also relevant to show the reason for Pavich's association with Avilla and the others living at Avilla's "drug house." Indeed, Pavich himself readily admitted that he used drugs to explain how he came in contact with Avilla and why he was staying at her apartment.

■ Finally, any possible error in the court's denial of the severance was harmless beyond a reasonable doubt. The bag containing the drug paraphernalia was recovered when Pavich abandoned it while fleeing from the police. The State introduced Pavich's flight to show his consciousness of guilt regarding Dr. Bird's murder. Pavich, however, explained his flight by claiming that he ran only because he had used drugs and was afraid of being caught with the drug paraphernalia in his bag. Because Pavich used evidence of his drug paraphernalia possession to his advantage, he can hardly complain that he was unfairly prejudiced by the court's refusal to sever the drug paraphernalia count.

---

**17.** At the time relevant to this case, HRS § 707–702(2) (1993) provided:

(2) In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of

## IV.

■ Pavich argues that the circuit court erred in refusing to give the jury his proffered instruction on manslaughter due to extreme mental or emotional disturbance (EMED). We disagree.

Under HRS § 707–702(2) (1993),[17] first and second degree murder are reduced to manslaughter, if "the defendant was, at the time he caused the death of the other person, [ (1) ] under the influence of extreme mental or emotional disturbance [ (2) ] for which there is a reasonable explanation." "The first prong of the test focuses on the defendant's reaction to the stress, and requires only that the defendant be under the influence of extreme mental or emotional disturbance...." *State v. Kaiama,* 81 Hawai'i 15, 25–26, 911 P.2d 735, 745–46 (1996) (quotation marks omitted).

> To satisfy the second prong of HRS § 707–702(2), i.e., a reasonable explanation, the defendant must satisfy a subjective/objective test. The circumstances must be viewed as the defendant believed them to be (subjective); however, the ultimate test is objective. There must be a reasonable explanation or excuse for the actor's disturbance. As such, HRS § 707–702(2) does not authorize mitigation on the basis of individual abnormality without any measure of the defendant against an objective standard.

*Id.* at 26, 911 P.2d at 746 (citations, quotation marks, ellipsis, and brackets omitted).

Pavich argues that he was entitled to an instruction on the mitigating defense of EMED because evidence showed that he was agitated and in a panic after the alleged commission of the murder. This argument is without merit.

In *State v. Moore,* 82 Hawai'i 202, 921 P.2d 122 (1996), the court emphasized that the relevant inquiry is whether the defendant was under the influence of an EMED "*at the*

extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.

*time* he [committed the crime]." *Id.* at 210, 921 P.2d at 130 (emphasis added). The defendant in *Moore* was arrested approximately thirty minutes after he shot his wife. *Id.* at 222, 921 P.2d at 142. Based on the shooting, the defendant was found guilty of attempted second-degree murder and use of a firearm in the commission of a felony. *Id.* at 205, 921 P.2d at 125. Testimony had been presented that the defendant was agitated, nervous, frantic, and anxious at the time of his arrest. *Id.* at 210, 921 P.2d at 130. The court held that such evidence did not support an EMED instruction because there was no evidence that the defendant was under the influence of an EMED at the time he committed the crime. *Id.* at 210–11, 921 P.2d at 130–31; *see also State v. Aganon,* 97 Hawai'i 299, 304, 36 P.3d 1269, 1274 (2001) (holding that "testimony about an incident occurring days after the alleged offense does not demonstrate any emotional disturbance with respect to the offense in question"). Similarly, an EMED defense is not supported by evidence that when Pavich *returned* to Avilla's apartment after allegedly committing the murder, he was not himself and he was in "kind of [a] panic."

■ Pavich also argues that he was entitled to an EMED instruction based on Estencion's testimony that Pavich told Estencion that Dr. Bird made a lot of noise and bit Pavich, causing Pavich to hit Dr. Bird on the head with a lamp. However, "it is implicit that extreme emotional disturbance will not reduce murder to manslaughter, if the actor has intentionally, knowingly, recklessly, or negligently brought about his own mental disturbance, such as by involving himself in a crime." *State v. Dumlao,* 6 Haw.App. 173, 182 n. 13, 715 P.2d 822, 829 n. 13 (1986), *overruled in part on other grounds by State*

*v. Seguritan,* 70 Haw. 173, 766 P.2d 128 (1988). Here, the evidence was that Dr. Bird bit Pavich in self-defense while Pavich was in the process of burglarizing Dr. Bird's apartment and robbing, kidnapping, and murdering Dr. Bird. Such evidence did not support an EMED defense, and the circuit court did not err in refusing to give an EMED instruction.

■ In any event, we conclude that any error in failing to give an EMED instruction was harmless beyond a reasonable doubt. Pavich testified that he did not cause the death of Dr. Bird and that he had never been in Dr. Bird's apartment. The State's evidence showed that Pavich encountered Dr. Bird while burglarizing Dr. Bird's apartment and that Pavich killed Dr. Bird to silence him and prevent him from subsequently identifying Pavich. Given the evidence presented at trial, there is no reasonable possibility that the outcome of the case would have been different had the circuit court given the EMED instruction proffered by Pavich.

## CONCLUSION

We affirm the circuit court's May 17, 2006, Judgment with respect to Pavich's conviction and sentence for possession with intent to use drug paraphernalia (Count 8). With respect to Pavich's other counts of conviction, we remand the case for further proceedings consistent with this opinion.